**WEILAND GOLDEN GOODRICH LLP**
Jeffrey I. Golden, State Bar No. 133040
jgolden@wgllp.com
Reem J. Bello, State Bar No. 198840
rbello@wgllp.com
Ryan W. Beall, State Bar No. 313774
rbeall@wgllp.com
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone 714-966-1000
Facsimile 714-966-1002

Proposed Attorneys for Debtor
and Debtor-in-Possession,
Coastal International, Inc.

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re<br><br>COASTAL INTERNATIONAL, INC., a Nevada corporation,<br><br>Debtor and Debtor-in-Possession. | Case No. 8:19-bk-13584-TA<br><br>Chapter 11<br><br>**EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF BRUCE GREEN IN SUPPORT THEREOF**<br><br>**DATE: September 18, 2019**<br>**TIME: 11:00 a.m.**<br>**CTRM: 5B** |

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATE BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL OTHER INTERESTED PARTIES:**

Coastal International, Inc., the debtor and debtor-in-possession ("Debtor") in the above-captioned chapter 11 bankruptcy case ("Case"), hereby moves the Court for an order authorizing the Debtor to obtain post-petition financing pursuant to 11 U.S.C.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

§§ 105, 361, 362, and 364 ("Motion") from Debtor's secured creditor Transportation Alliance Bank Inc. dba TAB Bank ("TAB Bank").

The Motion is based upon the foregoing, the Memorandum of Points and Authorities appended hereto, all other pleadings and papers on file in the Case, the arguments and representations of counsel, any oral or documentary evidence that may be properly presented to this Court at or before any hearing or ruling on the Motion, if a hearing is required.

The Debtor submits that the relief requested herein is in the best interest of the Debtor, its estate, creditors, and other parties-in-interest and therefore should be granted.

**WHEREFORE**, the Debtor respectfully requests the Court enter an order authorizing the Debtor to obtain post-petition financing.

Dated: September 17, 2019

WEILAND GOLDEN GOODRICH LLP

By: /s/ REEM J. BELLO

JEFFREY I. GOLDEN
REEM J. BELLO
Proposed Attorneys for Debtor and Debtor-in-Possession, Coastal International, Inc.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL BACKGROUND

### A. The Bankruptcy Filing

On September 13, 2019 (the "Petition Date"), the Debtor commenced the Case under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court"). The Debtor continues to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Case and no committee has been appointed or designated.

The purpose of the Case is to reorganize the Debtor's business operations and to propose a chapter 11 plan of reorganization.

### B. The Debtor's Operations

The Debtor is a Nevada corporation formed in 1984, which provides trade show installation and dismantling services in the exhibit and event industry. Debtor's operations extend into major cities across the United States and Debtor maintains a staff of trained, full-time employees to handle most any installation and dismantling project from start to finish. Debtor owns a proprietary specialized interface which enables it to streamline the flow of information between designer, client and event planner, show management and general contractor. Debtor has been a leader in the exhibit and event industry for over three decades. The Debtor generated approximately $24 million in revenues during 2018.

### C. The Secured Debt

Pre-petition, Debtor and TAB Bank entered into an accounts receivable purchase and security agreement dated as of February 3, 2016 ("Pre-Petition Agreement"). Attached as Exhibit "1" is a true and correct copy of the Pre-Petition Agreement. On April 26, 2018, the Pre-Petition Agreement was amended by the Debtor and TAB Bank ("Amendment"). Attached as Exhibit "2" is a true and correct copy of the Amendment. Pursuant to the Pre-Petition Agreement as amended by the Amendment, TAB purchased

certain designated accounts receivable from the Debtor. For each account purchased by TAB, TAB advanced 90% of the face value of the account to the Debtor. TAB performs the administrative services to collect the accounts from the account debtors of the Debtor and collections are paid into a lock box at TAB. Upon receipt of payment in full for each account, TAB credits 90% of the account to pay off the advance, and the additional 10%, less fees, interest, and expenses, is placed into a cash reserve account (the "Pre-Petition Cash Reserve Account"). Additionally, TAB receives into the same lock box payments on certain non-factored accounts of the Debtor, the proceeds of which are placed in the Pre-Petition Cash Reserve Account. In consideration of the foregoing, TAB Bank was granted a first priority security interest in substantially all of the Debtor's assets. As of the Petition Date, the outstanding obligation due and owing to TAB Bank was approximately $1.6 million. The face value of the factored accounts owing as of the Petition Date is approximately $1.8 million.

### D. Events Precipitating the Filing of the Chapter 11 Petition

Christopher Lindroth, an employee of Debtor suffered serious injuries while working at a trade show. Lindroth's mother and co-guardian, Marcia Dempe, brought a lawsuit alleging negligence and willful and wanton conduct against various entities including Global Experience Specialists, Inc. ("GES"), the official services contractor for the trade show. GES filed a separate complaint for contribution against Debtor. **GES is a direct competitor of the Debtor**. After trial, the jury returned a verdict of $34.15 million in favor of Dempe and Lindroth (collectively, "Plaintiffs") and against GES, but it also found Lindroth 35% at fault for his injuries, reducing the verdict to approximately $22.2 million. On GES's contribution claim, the jury allocated 75% of GES's responsibility to Debtor. On March 7, 2014, the Illinois circuit court ("Illinois Circuit Court") entered judgment on the verdict against GES in the amount of $22,197,500, and found that the verdict was subject to contribution of 75% from Debtor pursuant to GES's claim of contribution.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

GES filed a posttrial motion seeking, in part, to set the cap on Debtor's liability pursuant to Kotecki v. Cyclops Welding Corp., 146 Ill. 2d 155 (1991) (the "Kotecki Cap"). Following a hearing, the Illinois Circuit Court determined that the Kotecki Cap would be "the amount paid of the workers' comp[ensation] lien as of the time of the judgment" and any additional payments GES would make until the case was resolved. The Illinois Circuit Court also entered an order finding "no just reason to delay enforcement or appeal as to plaintiff and GES's posttrial motions".

On March 28, 2014, Debtor and Plaintiffs entered into a signed settlement agreement in which Debtor agreed to offer $1 million (the limit of its insurance coverage) and a waiver of its workers' compensation lien rights on that $1 million conditioned upon the trial court dismissing with prejudice all claims against Debtor. On March 31, 2014, Debtor filed a motion for a good faith finding, noting in part that the settlement agreement was "contingent upon [the circuit court] finding the settlement to be in good faith."

On May 19, 2014, GES objected to the proposed settlement, arguing that, its right to contribution from Debtor (approximating $16.65 million) would be extinguished for $1 million. The Metropolitan Pier and Exposition Authority (MPEA) joined GES's objection.

On May 27, 2014, Plaintiffs sent a letter to Debtor confirming prior telephone conversation that Plaintiffs were withdrawing consent to the agreement. On June 10, 2014, Plaintiffs filed an objection to the settlement agreement. Plaintiffs stated in the motion that, after the verdict and in anticipation of a lengthy appeals process, money was needed to remodel Lindroth's home to allow him to live on the first floor and move out of the nursing home in which he had been receiving 24-hour care.

On July 16, 2014, the Illinois Circuit Court held a hearing on Debtor's motion for a good-faith finding and to enforce settlement. The Illinois Circuit Court denied the motion

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

but explained that refusal to find good faith did not necessarily equate to a finding of bad faith: instead, the court noted that "the most important thing is that this court owes a duty to Mr. Lindroth". The Illinois Circuit Court also held that the Kotecki Cap would be "the amount of the workers' compensation lien that has already been paid and will be paid in the future." GES appealed the order of the Illinois Circuit Court with respect to the Kotecki Cap. Debtor filed a separate appeal challenging the Illinois Circuit Court's denial of Debtor's motion for a good faith finding as to a proposed settlement between Debtor and Plaintiffs and to enforce that settlement. The separate appeals of GES and Debtor were consolidated.

On March 31, 2016, the Illinois Supreme Court affirmed GES's appeal in part and dismissed it in part. The Illinois Supreme Court held that, despite having a Rule 304(a) finding, the Illinois Circuit Court's order setting the Kotecki Cap was not a final order because GES had not yet paid more than its pro rata share of the judgment. The Illinois Supreme Court also dismissed Debtor's appeal for want of jurisdiction, because not all of the claims of all parties had been resolved (namely, the MPEA's indemnification motion was unresolved), and the Illinois Circuit Court failed to make a Rule 304(a) finding as to the order denying Debtor's motion for a good faith finding and to enforce settlement.

On July 28, 2016, GES filed "release (satisfaction) of judgment" with the Illinois Circuit Court, indicating that Plaintiffs had executed the release on July 27, 2016, and had received "full satisfaction and payment of the judgment" against GES. GES then filed two notices of appeal: one within 30 days of the filing of the release and satisfaction of judgment, and another within 30 days of the issuance of the Illinois Supreme Court's mandate in the original suit filed by Plaintiffs. The Illinois Supreme Court consolidated the two appeals.

On April 10, 2017, while the appeal in Dempe II was pending, the circuit court entered an agreed order dismissing with prejudice all of MPEA's remaining claims against Coastal.  On June 16, 2017, the Illinois Supreme Court issued its decision holding that it still lacked jurisdiction over GES's appeal concerning the Kotecki Cap and dismissed GES's appeals.

On September 6, 2017, the Illinois Circuit Court entered judgment against Debtor and in favor of GES in the amount of $11,708,804.24, consisting of Debtor's pro rata 75% share of the judgment ($15,828,570) and 75% of the postjudgment interest ($3,095.073.30) less setoffs for payments by Debtor's insurers ($7,214,839.06).

On September 25, 2017, Debtor filed its notice of appeal.  On or about May 18, 2018, GES obtained a judgment in California against Debtor in the amount of $11,709,232.24, to enforce a sister state judgment.  On August 24, 2018, the Illinois Supreme Court upheld the Illinois Circuit Court's ruling denying Debtor's motion for a good faith finding and to enforce settlement.

After GES obtained a judgment in California, Debtor attempted to participate in settlement negotiations with GES.  In an attempt to settle the litigation with GES, Debtor produced documents to GES and Debtor was examined by GES's counsel (the production of documents and examination were agreed to pursuant to a stipulation and not pursuant to a subpoena or an order for appearance or examination).  Debtor and GES also participated in a one day mediation, but it did not result in settlement.

**E.    DIP Financing Agreement**

The Debtor seeks approval of a debtor-in-possession financing agreement titled the Accounts Receivable Purchase and Security Agreement ("DIP Financing Agreement") with TAB Bank, which is attached hereto as Exhibit "3."  The material terms of the DIP Financing Agreement are as follows:

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

(i)   Debtor Costal International Inc., as "Borrower," may sell, and TAB Bank may buy, receivables ("Accounts") arising from the sales or services provided to Debtor's customers;

(ii)  The advance rate will be 90%, which accrues at LIBOR rate plus 7 ½ percent;

(iii) The Accounts will be paid by customers directly to a TAB Bank lockbox and TAB Bank will perform all of the accounts receivable processing and collection work;

(iv)  If the Accounts are not paid when due, TAB Bank has the authority to follow up with the account debtors; and

(v)   When the Account is collected, 90% of the collection pays off the advance, and the balance is placed in a reserve account, less the interest that has accrued.

The relief sought by way of this Motion is consensual and is the result of a good faith arms-length negotiations between the Debtor and TAB Bank.

**F.    Efforts to Obtain Post-Petition Financing**

Debtor, in its business judgment, determined that a chapter 11 reorganization is the best means to maximize value to its creditors.  The Debtor identified TAB Bank as the most likely source of post-petition financing, given their liens on Debtor's assets and involvement with the Debtor's pre-petition loan facility.  The Debtor initiated a dialogue with TAB Bank regarding the possibility of providing debtor-in-possession financing to the Debtor.  TAB Bank expressed a willingness to provide debtor-in-possession financing to the Debtor and the Debtor and TAB Bank negotiated in good faith and at arm's-length with respect to the terms and conditions of the DIP Financing Agreement.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

## II. LEGAL ANALYSIS

### A. There is Cause to Grant Relief on an Emergency Basis

If the Court does not grant this Motion on an emergency basis, Debtor will be unable to pay its operating expenses and to fund payroll. Debtor's business, in this situation, would be irreparably harmed. Accordingly, there is cause to hear this Motion on an emergency basis.

### B. The Court Should Authorize the DIP Financing Agreement Pending a Final Hearing

A court may not approve the obtaining of credit, on a final basis, on less than 15 days after service of the motion. Fed. R. Bank. P. 4001(b)(2). Nonetheless, the court may approve interim financing to the extent necessary "to avoid immediate and irreparable harm to the estate pending a final hearing." *Id*.

Section 364(c) allows the trustee or debtor-in-possession, with court approval, and after notice and a hearing, to offer greater protection and incentives to lenders when credit cannot be obtained by the offering of a simple administrative priority. *See* 3 Collier on Bankruptcy ¶ 364.04 (15th rev. ed. 2006). Typically, "courts apply a three part test to assess requests under § 364(c), requiring a showing that 1) debtor cannot obtain credit unencumbered without super-priority status; 2) the credit transactions are necessary to preserve assets of the estate, and 3) the terms of the credit agreement are fair, reasonable and adequate." Collier on Bankruptcy, *supra*, ¶ 364.04; *see also In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa 1987); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990). To show that the credit required is not obtainable on an unsecured basis, a debtor needs only to demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by Section 364(c). . ." *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).

Debtor requests authority to enter into the DIP Financing Agreement during the chapter 11 bankruptcy proceeding. The terms of the proposed financing are fair,

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

reasonable, and consistent with industry standards. The financing is necessary to fund the Debtor's operations, and will allow the Debtor to continue generating revenue for the benefit of all creditors and the state as a whole. Without the requested relief, Debtor would likely be forced to liquidate and shut down operations, resulting in the layoff of hundreds of employees and leading to a reduced recovery for secured creditors and no recovery for unsecured creditors. Debtor has been unable to obtain similar financing on terms more favorable than those offered by TAB Bank. Accordingly, the proposed DIP Financing Agreement is in the best interests of the estate and creditors.

### C. TAB Bank is Entitled to the Protections Afforded to a Good Faith Lender Under Section 364(e)

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.
> 11 U.S.C. § 364(e).

In this case, the DIP Financing Agreement is the result of (i) the Debtor's reasonable and informed determination that TAB Bank offered the most favorable terms available on which to obtain needed post-petition financing, and (ii) is the product of extended arm's-length, good faith negotiations between and among the Debtor and TAB Bank. The terms and conditions of the DIP Financing Agreement are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are in the best interests of the Debtor, its estates and creditor. The proceeds under the DIP Financing Agreement will be used only for purposes that are

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

permissible under the Bankruptcy Code, no consideration is being provided to any party to the DIP Financing Agreement other than as described herein and TAB Bank extended the financing in reliance upon the protections offered by section 364(e) of the Bankruptcy Code. Section 364(e) provides a lender with a presumption of good faith. *Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC)*, 424 F.3d 963, 969 (9th Cir. 2005). Accordingly, the Debtor requests that the Court find that TAB Bank acted as a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

## III. CONCLUSION

Based on the foregoing, the Debtor respectfully requests that the Court enter an order approving the DIP Financing Agreement.

Respectfully submitted,

Dated: September 17, 2019

WEILAND GOLDEN GOODRICH LLP

By: /S/REEM J. BELLO
JEFFREY I. GOLDEN
REEM J. BELLO
Proposed Attorneys for Debtor and Debtor-in-Possession, Coastal International, Inc.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**DECLARATION OF BRUCE GREEN**

I, Bruce Green, declare as follows:

1. I am the Chief Executive Officer of Coastal International, Inc., the debtor and debtor-in-possession ("Debtor") in the above-captioned chapter 11 case. In my role as Chief Executive Officer, I am familiar with the daily operations of the Debtor's business. Except as otherwise noted, I have personal knowledge of the matters set forth in this Declaration and, if called as a witness, could testify competently thereto. I am submitting this Declaration in support of the Debtor's Motion for Order Approving Stipulation for Use of Cash Collateral Pursuant to 11 U.S.C. §§ 363(c)(2) and 363(b)(1) and Federal Rule of Bankruptcy Procedure 4001(d) (the "Motion"). All capitalized terms set forth in the Motion are incorporated herein by this reference.

2. The Debtor is a Nevada corporation formed in 1984, which provides trade show installation and dismantling services in the exhibit and event industry. Debtor's operations extend into major cities across the United States and Debtor maintains a staff of trained, full-time employees to handle most any installation and dismantling project from start to finish. Debtor owns a proprietary specialized interface which enables it to streamline the flow of information between designer, client and event planner, show management and general contractor. Debtor has been a leader in the exhibit and event industry for over three decades. The Debtor generated approximately $24 million in revenues during 2018.

3. Pre-petition, Debtor and TAB Bank entered into an accounts receivable purchase and security agreement dated as of February 3, 2016 ("Pre-Petition Agreement"). Attached as Exhibit "1" is a true and correct copy of the Pre-Petition Agreement. On April 26, 2018, the Pre-Petition Agreement was amended by the Debtor and TAB Bank ("Amendment"). Attached as Exhibit "2" is a true and correct copy of the Amendment. Pursuant to the Pre-Petition Agreement as amended by the Amendment, TAB purchased certain designated accounts receivable from the Debtor. For each

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

account purchased by TAB, TAB advanced 90% of the face value of the account to the Debtor. TAB performs the administrative services to collect the accounts from the account debtors of the Debtor and collections are paid into a lock box at TAB. Upon receipt of payment in full for each account, TAB credits 90% of the account to pay off the advance, and the additional 10%, less fees, interest, and expenses, is placed into a cash reserve account (the "Pre-Petition Cash Reserve Account"). Additionally, TAB receives into the same lock box payments on certain non-factored accounts of the Debtor, the proceeds of which are placed in the Pre-Petition Cash Reserve Account. In consideration of the foregoing, TAB Bank was granted a first priority security interest in substantially all of the Debtor's assets. As of the Petition Date, the outstanding obligation due and owing to TAB Bank was approximately $1.6 million. The face value of the factored accounts owing as of the Petition Date is approximately $1.8 million.

4. The Debtor seeks approval of a debtor-in-possession financing agreement titled the Accounts Receivable Purchase and Security Agreement ("DIP Financing Agreement") with TAB Bank, which is attached hereto as Exhibit "3."

5. Debtor identified TAB Bank as the most likely source of post-petition financing, given their liens on Debtor's assets and involvement with the Debtor's pre-petition loan facility. The Debtor initiated a dialogue with TAB Bank regarding the possibility of providing debtor-in-possession financing to the Debtor.

6. TAB Bank expressed a willingness to provide debtor-in-possession financing to the Debtor and the Debtor and TAB Bank negotiated in good faith and at arm's-length with respect to the terms and conditions of the DIP Financing Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of September, 2019, at Sausalito, California.

SEE ATTACHED SIGNATURE PAGE
BRUCE GREEN

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

TAB purchased certain designated accounts receivable from the Debtor. For each account purchased by TAB, TAB advanced 90% of the face value of the account to the Debtor. TAB performs the administrative services to collect the accounts from the account debtors of the Debtor and collections are paid into a lock box at TAB. Upon receipt of payment in full for each account, TAB credits 90% of the account to pay off the advance, and the additional 10%, less fees, interest, and expenses, is placed into a cash reserve account (the "Pre-Petition Cash Reserve Account"). Additionally, TAB receives into the same lock box payments on certain non-factored accounts of the Debtor, the proceeds of which are placed in the Pre-Petition Cash Reserve Account. In consideration of the foregoing, TAB Bank was granted a first priority security interest in substantially all of the Debtor's assets. As of the Petition Date, the outstanding obligation due and owing to TAB Bank was approximately $1.6 million. The face value of the factored accounts owing as of the Petition Date is approximately $1.8 million.

4. The Debtor seeks approval of a debtor-in-possession financing agreement titled the Accounts Receivable Purchase and Security Agreement ("DIP Financing Agreement") with TAB Bank, which is attached hereto as Exhibit "3."

5. Debtor identified TAB Bank as the most likely source of post-petition financing, given their liens on Debtor's assets and involvement with the Debtor's pre-petition loan facility. The Debtor initiated a dialogue with TAB Bank regarding the possibility of providing debtor-in-possession financing to the Debtor.

6. TAB Bank expressed a willingness to provide debtor-in-possession financing to the Debtor and the Debtor and TAB Bank negotiated in good faith and at arm's-length with respect to the terms and conditions of the DIP Financing Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of September, 2019, at Sausalito, California.

Bruce E. Green

BRUCE GREEN

# ACCOUNTS RECEIVABLE PURCHASE AND SECURITY AGREEMENT

THIS ACCOUNTS RECEIVABLE PURCHASE AND SECURITY AGREEMENT ("Agreement") is entered into this February 3, 2016, by and between Transportation Alliance Bank Inc. dba TAB Bank ("Purchaser") and Coastal International, Inc., Coastal International Holdings, LLC and Coastal International Trade Show Services, LLC (individually and collectively, the "Seller").

1. **Definitions.** The following terms used herein shall have the meanings as set forth immediately below. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

"Account" – any and all Accounts as defined in the UCC, accounts receivable, any and all amounts owing to Seller under any rental agreement or lease, payments on construction contracts, promissory notes or on any other indebtedness, any rights to payment customarily or for accounting purposes classified as accounts receivable, and all rights to payment, proceeds or distributions under any contract of Seller, presently existing or hereafter created, and all proceeds thereof.

"Account Debtor" – shall mean any Person obligated for payment of any Account.

"Administration Discount" – the per diem discount charged by Purchaser to Seller on each Purchased Account, which discount is based upon the number of days from the Purchase Date to the date the Account is Closed, said initial discount being set forth in Exhibit A attached hereto. The discount charged for each increment of time is cumulative, with each increment's discount being summed to calculate the total Administration Discount on a given Purchased Account. Purchaser may change the Administration Discount applicable to existing or future Purchased Accounts at any time, after giving Seller thirty (30) days prior written notice.

"Administration Fee" – the Administration Discount multiplied by the number of days from the Purchase Date to the date the Account is Closed.

"Annual Fee" – means an annual fee equal to the Maximum Amount multiplied by the percentage specified on Exhibit A, attached hereto. This fee shall be deducted annually from the Purchase Price otherwise owed by Purchaser to Seller on the Purchased Accounts, on or before each anniversary of the date this Agreement is accepted by Purchaser.

"Avoidance Claim" – any claim that any payment received by Purchaser from or for the account of an Account Debtor is an impugned or avoidable transaction under any bankruptcy, insolvency, preference, corporate or other similar laws.

"Balance Subject to Discount Fee" – the cumulative unpaid balance of the Purchase Price of all outstanding and unclosed Purchased Accounts minus the balance in the Reserve Account.

"Business Day" – any day other than a Saturday, Sunday and any day on which banks in the State of Utah are required or permitted to be closed.

"Clearance Days" – three (3) Business Days.

"Closed" – a Purchased Account is closed upon the first to occur of: (i) receipt of full payment by Purchaser; (ii) the unpaid Face Amount has been charged to the Reserve Account by Purchaser pursuant to the terms hereof; or (iii) if the unpaid Face Amount is five percent (5%) or less of the original Face Amount, or if the original Face Amount was less than $500 then if any payment is received on the Purchased Account that is less than 100%, then said Purchased Account shall be charged to the Reserve Account by Purchaser and the Purchased Account shall be closed. The closure of any Purchased Account by Purchaser shall not be construed so as to relieve Seller of any of its Obligations provided herein. Seller shall not be deemed to have satisfied its repurchase obligation if a Reserve Shortfall exists.

"Collateral" – any collateral now or hereafter described in any financing statement, continuation statement, financing change statement, or any other UCC-1 filing, or any other amendment, or similar security filing or registration statement filed against or executed by Seller naming Purchaser as the secured party, and all of Seller's right, title and interest in, to and under the following property, now owned or hereafter acquired:

(i) All Accounts (including any Exclusions and any Accounts purchased by Purchaser hereunder and repurchased by Seller), chattel paper, general intangibles, including, but not limited to, tax refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, trade secrets, customer lists, licenses, documents, instruments, deposit accounts, certificates of deposit, and all rights of Seller as a seller of goods, including rights of reclamation, replevin and stoppage in transit;

(ii) All Inventory as defined in the Uniform Commercial Code, wherever located, all goods, merchandise or other personal property held for sale or lease, names or marks affixed thereto for purposes of selling or identifying the same or the seller or manufacturer thereof and all related rights, title and interest, all raw materials, work or goods in process or materials or supplies of every nature used, consumed or to be used in Seller's business, all packaging and shipping materials, and all other goods customarily or for accounting purposes classified as inventory of Seller, now owned or hereafter acquired or created, all proceeds and products of the foregoing and all additions and accessions to, replacements of, insurance or condemnation proceeds of, and documents covering any of the foregoing, all property received wholly or partially in trade or exchange for any of the foregoing, all leases of any of the foregoing, and all rents, revenues, issues, profits and proceeds arising from the sale, lease, license, encumbrance, collection, or any other temporary or permanent disposition of any of the foregoing or any interest therein;

(iii) All Equipment and fixtures and goods, wherever located, and all additions, substitutions, replacements (including spare parts), and accessions thereof and thereto;

(iv) All books and records relating to all of the foregoing property and interests in property, including, without limitation, all computer programs, printed output and computer readable data in the possession or control of the Seller, any computer service bureau or other third party;

(v) All investment property; and

(vi) All proceeds of the foregoing, including but not limited to, all insurance proceeds, all claims against third parties for loss or destruction of or damage to any of the foregoing, and all income from the lease or rental of any of the foregoing.

"Default Rate" means the per annum Discount Fee Rate plus five percent (5.00%) per annum

"Discount Fee Rate" – a per annum rate of interest applied on a per diem basis, in the amount set forth in Exhibit A attached hereto. Purchaser may change the Discount Fee Rate applicable to existing or future Purchased Accounts at any time, after giving Seller thirty (30) days prior written notice.

"Early Termination Fee" – an amount equal to the Minimum Monthly Fee multiplied by the number of months (prorated for partial months) by which the termination date requested by Seller precedes the termination date of this Agreement as set forth in Section 18 hereof.

"Eligible Account" – see Section 3 hereof.

"Events of Default" – see Section 16 hereof.

"Exclusions" – The Accounts from time to time which Seller elects not to offer to sell to Purchaser (in each instance constituting all of the Accounts of a subject Account Debtor), and which Purchaser consents, in writing, at Purchaser's sole discretion and judgment, to allow Seller to exclude from its offer of sale to Purchaser. Such excluded Accounts shall still be subject to Purchaser's security interest as granted by Seller herein to secure the performance of Seller's Obligation hereunder. Upon any Event of Default, the excluded Accounts shall cease to be excluded, and Seller shall be deemed to have offered said Accounts to Purchaser for purchase.

"Face Amount" – the total amount due specified on an Account's invoice, at the time of Purchase, less any finance charges included therein.

"Guarantor" – the Person(s) guaranteeing the payment and performance of the Obligations, as set forth in Exhibit A attached hereto.

"Invoice" – the document(s) that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

"Late Charge" – 0.15% per diem.

"Late Payment Date" – the date which is ninety (90) days from the Invoice date of a Purchased Account.

"Maximum Amount" – see Exhibit A attached hereto, or such other amount as Purchaser shall deem appropriate in its sole discretion.

"Minimum Monthly Fee" means a fee equal to the Maximum Amount multiplied by the percentage specified on Exhibit A.

"Misdirected Payment Fee" – fifteen percent (15%) of the total amount of any check or other payment which includes, in whole or in part, payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next Business Day following the date of receipt by Seller.

"Missing Notation Fee" – fifteen percent (15%) of the Face Amount.

"Notation" – "This account has been assigned and is payable to Transportation Alliance Bank Inc. dba TAB Bank. To the extent that you are now indebted, or may in the future become indebted to the Seller on any account or general intangible, payment thereof should be made payable to Seller, and sent to TAB Bank, P.O. Box 150290, Ogden, Utah 84415-0290."

"Obligation" – all present and future obligations owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any bankruptcy, insolvency or other similar proceeding in which Seller is a debtor or an insolvent debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

"Origination Fee" – a fee charged by Purchaser to Seller, in an amount equal to the Maximum Amount multiplied by the percentage set forth in Exhibit A, attached hereto. This fee shall be deducted one time from the Purchase Price otherwise owed by Purchaser to Seller on the Purchased Accounts at the time of the first submission of Accounts to Purchaser to purchase.

"Parties" – Seller and Purchaser.

"Person" – any individual, corporation, limited liability company, partnership, trust; or any other legal entity or organization.

"Purchased Accounts" – Accounts purchased hereunder which have not been Repurchased.

"Purchase Date" – the date on which Seller has been advised in writing, or in another manner as elected by Purchaser in its sole discretion, that Purchaser has agreed to purchase an Account.

"Purchase Price" – the Face Amount of the Purchased Account.

"Repurchased" – subject to the terms and conditions set forth herein, an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount upon demand by Purchaser under the terms hereof.

"Required Reserve Amount" – the cumulative total of the respective Reserve Percentage for each Purchased Account multiplied by the unpaid balance of each such Purchased Account, or such other percentage as Purchaser shall deem appropriate in its sole discretion.

"Reserve Account" – a bookkeeping account on the books of the Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

"Reserve Percentage" – the percentage set forth in Exhibit A attached hereto, or such other percentage as Purchaser shall deem appropriate in its sole discretion.

"Reserve Shortfall" – the amount by which the Reserve Account is less than the Required Reserve Amount.

"Schedule of Accounts" – a paper or electronic form supplied or approved by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms hereof, and from which Purchaser may elect to purchase all or any portion of said Accounts without further notification to Seller being required hereunder.

"Seller's Account" – any demand deposit account maintained by Seller or any Guarantor or represented by an employee of Seller to be maintained by Seller, or any other account of Seller into which Seller

directs Purchaser to make advances or payments of any obligations owed by Purchaser to Seller.

"Serviced Account" – an Account that is not purchased by Purchaser hereunder, but which invoice and other documentation underlying said Account is forwarded by Purchaser, on behalf of Seller, to the Account Debtor for payment.

2. **Submission of Accounts to Purchaser.** Seller shall be required hereunder to submit all of Seller's Accounts to Purchaser, excluding only the Exclusions. Seller shall submit said Accounts within seven (7) days of the invoice date after the goods are sold or delivered, or services performed giving rise to the Accounts. Seller shall submit the Accounts via a Schedule of Accounts. Seller shall be free to elect which Accounts it wishes to sell to Purchaser, and which Accounts it does not wish to sell to Purchaser; provided, however, unless otherwise agreed in writing by Purchaser (such consent to be at Purchaser's sole discretion), where Purchaser purchases any Account of a given Account Debtor, Seller shall remit, and Purchaser shall be entitled to receive, all payments on all Accounts of that Account Debtor, regardless of whether or not such Accounts are Purchased Accounts. Purchaser is under no obligation to purchase any Account that is submitted to Purchaser. Any Account which is not purchased by Purchaser shall be deemed to be a Serviced Account; and shall, at Purchaser's option, either be (i) returned to Seller, or (ii) forwarded by Purchaser to the respective Account Debtor for payment as a Serviced Account. In the event Purchaser forwards a Serviced Account on to the Account Debtor for payment, Seller shall pay Purchaser a processing fee equal to $5.00 for each such Serviced Account, said fee to be charged against Seller's Reserve Account. Purchaser shall be authorized to deduct said fee from any amounts owed by Purchaser to Seller. Purchaser's only obligation with regard to a Serviced Account shall be to forward it to the Account Debtor, and to process any collections received by the Account Debtor on the Serviced Account. Purchaser shall deposit in Seller's Reserve Account any funds collected on Serviced Accounts, upon Purchaser's receipt of cleared funds from the Account Debtor. If any payments so received are returned as not collectable or non-sufficient funds, then Purchaser shall notify Seller, whereupon Purchaser shall have no further obligations with regard to the Serviced Account, and Seller may then pursue whatever collection efforts from the Account Debtor that it deems appropriate.

3. **Eligible Accounts.** Purchaser will only consider for purchase those Accounts of Seller, which are Eligible Accounts. To be an Eligible Account, an Account must meet all of the following requirements and conditions: (i) the Account shall be evidenced by an Invoice submitted to Purchaser meeting the following conditions: (a) contains the Seller's name, Invoice number and date, (b) contains the full and complete name and address of the Account Debtor, (c) clearly sets forth the amount owing and to be collected by Purchaser, (d) clearly states the due date and any other terms for payment of the Account, (e) is completely legible, (f) contains the Account Debtor's applicable purchase order, load number, or other equivalent number, if any, (g) is accompanied by such other documents as are required by Purchaser in its sole discretion, and (h) receives credit approval and is accepted by Purchaser in its sole discretion; (ii) the Account shall be submitted to Purchaser within seven (7) days of the date the goods are sold or delivered, or services performed giving rise to the Account are completed, except as otherwise approved in writing by Purchaser; (iii) the Invoice shall be accompanied by proof of acceptance, delivery (including, at a minimum, the original signed bill of lading, if applicable), or shipment of goods, or performance of services as is acceptable to Purchaser; and (iv) the Account shall meet and comply with the following conditions: (a) Seller has sole and unconditional good title to the Account, and the Account and any goods sold to create the Account being free from any other security interest, assignment, lien or other encumbrance of any type, (b) the Account is a bona fide obligation of the Account Debtor for the Face Amount and there have been no payments, deductions, credits, payment terms, or other modifications or reductions in the amount owing on such Account except as set forth on the face of the Invoice, (c) there are no defenses or setoffs to payment of the Account which can be asserted by way of defense or counterclaim against Seller or Purchaser, (d) the Account will be timely paid in full by the Account Debtor, (e) any services performed or goods sold which give rise to the Account have been rendered or sold and delivered in compliance with all applicable laws, ordinances, rules and regulations and were performed or sold in the ordinary course of Seller's business, (f) there have been no extensions, modifications or other agreements relating to payment of such Account except as shown upon the face of the Invoice, (g) the Account Debtor is located or authorized to do business within the United States, and (h) no proceeding has been commenced or petition filed under any bankruptcy or insolvency law by or against the Account Debtor, no receiver, trustee or custodian has been appointed for any part of the property of the Account Debtor, and no property of the Account Debtor has been assigned for the benefit of creditors. Seller acknowledges and agrees that at Purchaser's sole discretion, Purchaser may require Seller to remit original copies of any documentation relating to an Account, and Seller agrees to promptly send such original documentation to Purchaser.

4. **Sale; Purchase Price; Billing; Reserve.**

**Sale.** Seller shall offer to sell to Purchaser as absolute owner, such of Seller's Accounts as are listed from time to time on Schedules of Accounts. Each such Schedule of Accounts shall be accompanied by such documentation supporting, validating, and evidencing the listed Accounts as Purchaser shall from time to time request. Purchaser may purchase from Seller such Accounts from the Schedule of Accounts as Purchaser determines to be an Eligible Account, so long as the total outstanding Face Amount of all Purchased Accounts does not exceed, before and after such purchase, the Maximum Amount. However, Purchaser may change the Maximum Amount, either temporarily or permanently, to accommodate the purchase of any Eligible Account, as Purchaser deems desirable in its sole discretion. Purchaser's purchase of Eligible Accounts is at its sole discretion, and Purchaser shall have no obligation to purchase any Account, Eligible or otherwise, from Seller. Purchaser may decline to purchase any Account submitted by Seller for any reason or for no reason, without notice, regardless of any course of conduct or past purchase of Accounts by Purchaser.

**Exclusivity.** During the term of this Agreement, Purchaser shall be the sole and exclusive purchaser or factor for Seller's Accounts, and Seller shall not sell, factor or otherwise finance its accounts receivable except with Purchaser.

**Purchase Price.** At the request of Seller, Purchaser shall pay all or any portion of the Purchase Price, less any amounts due to Purchaser from Seller (including, without limitation, any Reserve Shortfall, any Administration Fees, and less any other fees and costs provided for in this Agreement) at the Discount Fee Rate, on the Balance Subject to Discount Fee that has accrued but has not yet been paid to Seller, of any Purchased Account, from time to time to Seller's Account. Any portion of the Purchase Price that Seller has not requested to be paid to Seller's Account, shall be held in the Seller's Reserve Account. Upon payment of all or any portion of the Purchase Price to Seller's Account or to Seller's Reserve Account, the Account shall be deemed purchased hereunder.

**Billing.** Purchaser may send a monthly statement to all Account Debtors itemizing their Account activity during the preceding billing period. All Account Debtors will be instructed to make payments to Purchaser.

**Reserve.** Purchaser may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall. Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall.

Provided that no Event of Default exists hereunder, and provided further that Purchaser, in its sole discretion and acting in good faith, has no concerns about Seller's ability to continue to perform its obligations hereunder, Purchaser may pay to Seller any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount. Payment by Purchaser of said funds to Seller shall be made in accordance with any written instructions of Seller which are agreed to by Purchaser. Unless otherwise instructed by Seller, payments shall be made by a medium selected by Purchaser.

Purchaser may charge the Reserve Account with any Obligation, including any amounts due from Seller or Guarantor to Purchaser hereunder. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account. Upon termination of this Agreement, Purchaser may retain the funds in the Reserve Account for ninety (90) days thereafter, or at Purchaser's option, for so long as any Obligations remain outstanding (including without limitation, any Obligations which were unknown to Purchaser at the time of termination), and may apply any such funds as payments towards such Obligations.

5. **Collection Procedures.** Purchaser shall have the exclusive right to collect any and all Accounts whether purchased by Purchaser or otherwise and receive payments thereon. Seller shall not bill for, submit any invoice for, or otherwise attempt to collect or interfere in any manner with the collection of any Accounts except as authorized in writing by Purchaser. Seller agrees to pay all reasonable handling and out of pocket costs incurred by Purchaser in collection of the Accounts, including, without limitation, postage, credit and search expenses, photocopy charges, and long distance phone expenses. Payment of such costs shall be due immediately upon request; and Purchaser may deduct such costs from amounts otherwise owing to Seller by Purchaser. Seller shall promptly and completely respond to all requests from Purchaser for any information or records requested to assist in the collection of said Accounts. If Seller fails to respond to any such request within two (2) days, Purchaser may, where applicable, require Seller to Repurchase the Account. Upon Purchaser's request, Seller may authorize Purchaser to revise the amount of or otherwise modify an Account. Purchaser shall have no obligation to advise the Account Debtor of such revision except to send the Account Debtor any revised invoice, which may be provided to Purchaser by Seller. In the event such revision results in a reduction in the amount owing on any Account, Purchaser may, where applicable, require Seller to Repurchase said Account.

In the event an Account Debtor makes payment to Seller on a Purchased Account, Seller shall immediately deliver the payment to Purchaser. If payment is made in cash, such payment shall be immediately delivered to Purchaser. If payment is made by check or similar instrument, such instrument shall be immediately delivered to Purchaser in the form received without negotiation. Upon inquiry from the Account Debtor or upon request of Purchaser, Seller shall notify the Account Debtor to make payment directly to Purchaser. Any payments received by Seller on Purchased Accounts shall be held in trust by Seller for Purchaser.

Seller shall immediately notify Purchaser in writing of any dispute between Seller and an Account Debtor concerning a Purchased Account, and of any bankruptcy filing, lien, garnishment or other legal action concerning said Account Debtor or Accounts. Purchaser shall make a good faith, commercially reasonable effort to collect the Purchased Accounts. It is agreed that the collection of Accounts in a commercially reasonable manner does not require, and Purchaser shall have no obligation to commence any legal action, including, without limitation, the sending of an attorney's demand letter, to collect any Account. Seller hereby waives and releases any and all claims relating to or arising out of any act or omission by Purchaser in the collection of the Purchased Accounts and Serviced Accounts, only intentional misconduct excepted. Upon request of Purchaser, Seller will cause all payments on all Accounts of Seller, whether or not Purchased Accounts, to be sent directly to such address as may be designated by Purchaser. Purchaser is authorized to receive and open all such payments and retain such amounts as are owing to Purchaser. Upon request of Purchaser, Seller will tender to Purchaser all payments received by Seller from an Account Debtor on Accounts created after Seller begins offering any Accounts of that Account Debtor for purchase by Purchaser. Upon such request being made, all such payments received by Seller shall be the sole and exclusive property of Purchaser and shall be held in trust by Seller for Purchaser. All such payments shall be applied on obligations of that Account Debtor to Purchaser. In the event Purchaser receives any payment from an Account Debtor on an Account which is not a Purchased Account, Purchaser may, subject to any rights of the Account Debtor, apply such payment to any other Obligation of Seller owing to Purchaser, including, without limitation, any Repurchase requirements provided herein or funding of any Reserve Shortfall.

Seller acknowledges and agrees that it has no right, title or interest whatsoever in the funds constituting payment of a Purchased Account, that said funds are the sole and exclusive property of Purchaser, and that any use of or interference with said funds by Seller may result in civil and criminal liability.

6. **Authorization for Purchase.** Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts upon telephonic, facsimile or other instructions received from anyone purporting to be an officer, employee or representative of Seller.

7. **Fees and Expenses.** Seller shall pay to Purchaser: (i) discount fees, at the Discount Fee Rate, on the Balance Subject to Discount Fee, from the date upon which an Account is purchased hereunder, with said discount fee being due and payable monthly on the last Business Day of the calendar month in which it accrues; (ii) the Administration Fee on each Purchased Account at the time each said Purchased Account is Closed; (iii) any Misdirected Payment Fee immediately upon its accrual; (iv) any Missing Notation Fee on any Invoice that is sent by Seller to an Account Debtor that does not contain the notice as required by Section 12 hereof; (v) any amount by which the sum of the fees and charges earned in any month (prorated for partial months) is less than the Minimum Monthly Fee, to be paid on the last Business Day of the calendar month in which it accrues; (vi) the Early Termination Fee if Seller terminates this Agreement or prepays the Obligations (whether by acceleration or otherwise) prior to the termination date set forth herein, computed from the date of termination to the date on which termination is requested by Seller pursuant to Section 18 hereof; (vii) the Late Charge on all past due amounts due from Seller to Purchaser hereunder, and on the amount of any Reserve Shortfall; (viii) any and all other fees and charges referred to herein, at the earlier of the time required by the terms hereof or when billed by Purchaser; and (ix) any expenses directly incurred by Purchaser in the administration of this Agreement such as wire transfer fees, postage, extra-ordinary collection costs, periodic UCC or tax lien searches, and audit fees,

calculated at Purchaser's standard fee schedule, a copy of which will be provided to Seller upon request; (x) in the event any applicable law, statute, rule or regulation shall subject Purchaser or any of its affiliates to any tax levy (other than taxes imposed on or measured by the overall net income of Purchaser), duty, impost, duty, charge, fee, deduction or withholding, or increase the cost to Purchaser of purchasing Accounts due to the application or use of the LIBOR Rate, then upon written demand therefor, Seller shall reimburse Purchaser for all such costs and expenses. Any amounts owed by Seller to Purchaser shall be paid by Seller, at Purchaser's option, by: (a) charging said amounts to the Reserve Account; (b) deducting said amounts from the Purchase Price otherwise directed by Seller to be deposited into Seller's Account; (c) debiting said amounts from Seller's Account; or (d) Seller's paying said amounts, in cash or other good funds acceptable to Purchaser, immediately upon demand made by Purchaser.

8. **Repurchase of Accounts.** Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof, together with any unpaid fees relating to the Purchased Account(s) on demand: (i) any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, or upon which the Account Debtor has taken any offsets, credits, discounts and/or short pays, Purchaser being under no obligation to determine the bona fides of such dispute; (ii) all Purchased Accounts upon the occurrence of an Event of Default, or upon the termination date of this Agreement; and (iii) any Purchased Account which remains unpaid beyond the Late Payment Date or in which Purchaser for any reason, in good faith, believes that such Purchased Account will not be timely paid by the Account Debtor. Seller agrees that any repurchase pursuant to the terms and conditions herein shall not authorize Seller to collect any outstanding sum owing on a Repurchased Account from an Account Debtor and Purchaser may in its sole judgment and discretion charge any and all amounts owed by Seller herein to Seller's Reserve Account. Seller further agrees that any and all repurchase requirements herein shall be considered paid to Purchaser only after all payment and performance obligations and the Obligations owing to Purchaser by Seller have been indefeasibly paid in full.

9. **Security Interest.** As collateral securing the Obligations, Seller grants to Purchaser a continuing first priority perfected security interest in, to and under the Collateral. Notwithstanding the creation of said security interest, the relationship of the parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower.

10. **Clearance Days.** For all purposes under this Agreement, including but not limited to the determination of when a Purchased Account is Closed, Clearance Days will be added to the date on which any payment is received by Purchaser, or on which it is Repurchased by Seller.

11. **Authorization to Purchaser.** Seller hereby irrevocably authorizes Purchaser at Seller's expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full: (i) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof; (ii) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the Accounts and other Collateral; (iii) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller; (iv) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any Account Debtor or other obligor (including filing of any public record releasing any lien granted to Seller by such Account Debtor), without affecting any of the Obligations; (v) execute in the name of Seller and file against Seller in favor of Purchaser financing statements or amendments with respect to the Collateral; (vi) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable; (vii) file in the name of Seller or Purchaser or both: (a) mechanic's lien or related notices or (b) claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty; and (viii) notify any Account Debtor obligated with respect to any Account, including but not limited to any and all Exclusions, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser.

In consideration of Purchaser accepting the Accounts of Seller for purchase, Seller hereby releases and exculpates Purchaser, its officers, employees and designees, upon each submission of Accounts to Purchaser by Seller, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special, punitive, consequential or exemplary damages. Without limiting the generality of the foregoing, Seller releases Purchaser from, and expressly waives any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

Seller authorizes Purchaser to accept, endorse and deposit on behalf of Seller any checks tendered by an Account Debtor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under the Uniform Commercial Code, or otherwise.

In order to satisfy any of the Obligations, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH system to Seller's Account or any other deposit account maintained by Seller wherever located. Seller may only terminate this authorization by giving Purchaser thirty (30) days' prior written notice of termination.

12. **Covenants by Seller.** Seller shall not, without the prior written consent of Purchaser, which consent shall be in Purchaser's sole discretion: (i) grant any extension of time for payment of any of the Accounts or any other Collateral which includes a monetary obligation, (ii) compromise or settle any of the Accounts or any such other Collateral for less than the full amount thereof, (iii) release in whole or in part any Account Debtor or other person liable for the payment of any of the Accounts or any such other Collateral, (iv) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts or any such other Collateral; or (v) sell, pledge, transfer, assign or grant a security interest in any of the Collateral.

From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to any Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if

after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records as Purchaser may request. Seller shall reimburse Purchaser for all costs incurred by Purchaser relating thereto, including, without limitation, costs of any and all third parties retained by Purchaser. Without expense to Purchaser, Seller agrees that Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

Before sending any Invoice evidencing an Account to an Account Debtor, Seller shall mark same with the Notation, or such other notation as Purchaser shall have advised Seller in writing.

Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require. Seller shall not create, incur, assume or permit to exist any lien upon or with respect to any Collateral now owned or hereafter acquired by Seller.

Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion. Seller shall furnish to Purchaser: (i) upon written request, any and all information concerning such insurance carried; and (ii) as requested by Purchaser, lender loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty (30) days' prior written cancellation notice to Purchaser.

Seller agrees to maintain motor vehicle, casualty, cargo, commercial and general liability insurance with a responsible insurance company reasonably acceptable to Purchaser in such amounts and against such risks as is usually carried by responsible companies engaged in similar business; and cause Purchaser to be designated as additional insured with respect to such insurance; obtain the certification of such insurer that such insurance shall not be cancelled or terminated, nor shall the coverage or terms or exclusions thereof be materially modified without at least thirty (30) days prior written notice to Purchaser.

Seller hereby assigns to Purchaser all of its interest in and rights to any inventory or other goods giving rise to the Accounts purchased by Purchaser which may be returned by Account Debtors, all rights as an unpaid vendor or lienor, all rights of stoppage in transit, replevin and reclamation relating thereto, all rights in and to all security therefore and guarantees thereof, all rights against third parties with respect thereto, and all rights under the Uniform Commercial Code and any other law, statute, regulation or agreement. Any goods so recovered or returned shall be set aside, marked with the name of Purchaser, and held for the account of Purchaser. Seller will promptly notify Purchaser of all such returned or recovered inventory or goods. Upon request, Seller shall deliver such inventory or other goods to Purchaser. Purchaser may take possession of such inventory or other goods and resell such inventory or other goods. Seller shall pay all reasonable costs and expenses incurred in taking possession and selling such inventory and other goods, including, without limitation, reasonable attorney's fees and legal expenses, transportation expenses, storage expenses, insurance and sales commissions. Such reasonable costs and expenses shall constitute additions to the Obligation owed by Seller to Purchaser. All proceeds from such resale shall be retained by Purchaser and the net proceeds credited against the Obligation of Seller.

Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee pursuant to the terms hereof, Seller shall deliver in kind to Purchaser on the next Business Day following the date of receipt by Seller the amount of any payment received by Seller on account of a Purchased Account. Seller hereby agrees to indemnify and hold Purchaser harmless from any loss arising out of: (i) the receipt by Seller of any payment on a Purchased Account and failure by Seller to timely remit such payment; and (ii) the assertion of any Avoidance Claim. Seller shall notify Purchaser within two (2) Business Days of it becoming aware of the assertion of an Avoidance Claim.

Seller agrees to submit financial statements to Purchaser, upon Purchaser's request, and Seller shall cause anyone guaranteeing Seller's Obligations hereunder to submit financial statements for such Guarantor to Purchaser as may be requested by Purchaser. All such financial statements shall be prepared in accordance with generally accepted accounting principles and shall be in a form and from an reputable accounting firm. Seller hereby represents and warrants that all financial statements of Seller, and of any Guarantor submitted to Purchaser shall fairly present the financial condition of Seller and any such Guarantor as of the date thereof and the results of operations for the period or periods covered thereby. Seller further represents and warrants, that since the date of the most recent financial statements, and since the date of the most recent purchase of Accounts by Purchaser from Seller, there has been no material or adverse change in the financial condition of Seller or any such Guarantor.

Seller hereby consents to Purchaser's disclosing to any third party, any and all information, knowledge, reports and records, including, without limitation, financial statements, concerning Seller or any Guarantor.

**13. Account Disputes.** Seller shall notify Purchaser promptly of, and if requested by Purchaser will settle, any disputes concerning any Purchased Account at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms as Purchaser in its sole discretion deems advisable, for Seller's account and risk at Seller's sole expense. Upon the occurrence of an Event of Default, Purchaser may Resolve such issues with respect to any Account of Seller.

**14. Perfection of Security Interest.** Seller shall execute and deliver to Purchaser such documents and instruments, including, without limitation, Uniform Commercial Code financing statements, as Purchaser may request from time to time in order to evidence and perfect its security interest in any Collateral securing the Obligations. Seller hereby agrees to reimburse Purchaser in full for any and all costs incurred by Purchaser arising from any actions taken by Purchaser to ensure the priority of its security interest in the Collateral, including but not limited to any and all Uniform Commercial Code searches.

**15. Representations and Warranties.** Seller represents and warrants that: (i) Seller has and shall maintain the full power and authority to own its assets and to conduct the business in which it engages and to enter into and perform its Obligations under this Agreement; (ii) this Agreement constitutes a legal, valid and binding

obligation of Seller; (iii) Seller is solvent; (iv) Seller has been duly organized or incorporated, as the case may be, and is in good standing, under the laws of the state of its organization or incorporation; (v) the place of business of Seller, or, if Seller has more than one place of business, the location of its chief executive office is the location noted in Section 23 hereof, and will not be moved therefrom without at least thirty (30) days' prior written notice to Purchaser; (vi) all records of Seller pertaining to the Purchased Accounts shall be kept and stored in the location noted in Section 23 hereof, and will not be moved therefrom without at least thirty (30) days' prior written notice to Purchaser; (vii) Seller is duly qualified to do business and is in good standing in each jurisdiction where the conduct of its business requires such qualification; (viii) Seller has all necessary licenses and other certificates or permits required for the conduct of its business and all such necessary licenses and other certificates or permits are current and will be maintained at all times; (ix) the execution, delivery and performance by Seller of this Agreement have been duly authorized by all necessary action on the part of Seller, and are not inconsistent with any Articles of Incorporation, Articles of Organization, By-Laws, Partnership Agreement, or other organizational documents of Seller, do not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract or other instrument to which Seller is a party or by which it is bound, and upon execution and delivery hereof, this Agreement will constitute a legal, valid and binding agreement and obligation of Seller, enforceable in accordance with its terms; (x) Seller shall conduct its business in a lawful manner and in compliance with all applicable federal, state and local laws, ordinances, rules, regulations, and orders and shall pay when due all lawfully imposed taxes upon its property, business and income; (xi) there is no pending or threatened action or proceeding against or affecting Seller before any court, governmental agency or arbitrator, which may, in any one case or in the aggregate, materially adversely affect the financial condition, operations, properties or business of Seller to perform its Obligations under this Agreement; (xii) Seller has satisfied all judgments, and Seller is not in default with respect to any judgment, writ, injunction, state decree, rule or regulation of any court, arbitrator or federal, municipal, or other governmental authority, commission, board, bureau, agency or instrumentality; and (xiii) this Agreement, the financial statements referred to herein, each Statement of Accounts submitted or to be submitted to Purchaser under this Agreement, and all other statements and Account information furnished or to be furnished to Purchaser in connection herewith, contain, or shall at the time of their submission to Purchaser contain, no untrue statement of a material fact and omit no material fact necessary to make the statements contained therein or herein not misleading.

16. **<u>Default; Events of Default; Waiver; and Effect</u>.** The following events will constitute an Event of Default hereunder: (i) Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser, or any warranty or representation contained herein proves to be false in any way, howsoever minor; (ii) Seller or any Guarantor of the Obligations becomes subject to any debtor-relief proceedings; (iii) any such Guarantor fails to perform or observe any of such Guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever; and/or (iv) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

Seller waives any requirement that Purchaser inform Seller by affirmative act or otherwise of any acceleration of Seller's obligations hereunder. Further, Purchaser's failure to charge or accrue interest or fees at any "default" or "past due" rate shall not be deemed a waiver by Purchaser of its claim thereto.

Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall become immediately due and payable without notice. The Late Charge and Default Rate shall accrue and be payable on demand on any Obligation not paid when due, including without limitation, pre judgment and post judgment.

No failure to exercise and no delay in exercising any right, power or remedy hereunder shall impair any right, power or remedy which Purchaser may have, nor shall any such delay be construed to be a waiver of any of such rights, powers or remedies, or any acquiescence in any breach or default hereunder, nor shall any waiver by Purchaser of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Purchaser hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which Purchaser would otherwise have. Any waiver, permit, consent or approval by Purchaser of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance; and shall not be effective until Seller has paid to Purchaser a $50.00 default waiver fee.

17. **<u>Account Stated</u>.** Purchaser shall render or make available to Seller a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Seller as an account stated, except to the extent that Purchaser receives, within sixty (60) days after the mailing or making available of such statement, written notice from Seller of any specific exceptions by Seller to that statement, and then it shall be binding against Seller as to any items to which it has not objected.

18. **<u>Termination; Effective Date</u>.** This Agreement shall be effective when accepted by Purchaser, and shall continue in full force and effect for the time period set forth in <u>Exhibit A</u> attached hereto; and shall be further extended automatically for successive twelve (12) month periods, unless Seller shall have given Purchaser written notice of its intention to terminate at least ninety (90) days prior to the expiration of the original term or any renewal period, whereupon this Agreement shall terminate upon the expiration of said original term or renewal period, as applicable. Upon termination, Seller shall pay in full all Obligations to Purchaser. Notwithstanding anything in this Agreement to the contrary, and assuming no Event of Default by Seller (in which event Purchaser may terminate without notice), Purchaser may terminate this Agreement at any time by giving not less than thirty (30) days notice in which event, Seller shall not be obligated to pay any Early Termination Fees.

19. **<u>Choice of Law and Venue</u>.** This Agreement and all transactions or disputes arising directly or indirectly hereunder shall be governed by, construed under and enforced in accordance with the internal laws of the State of Utah. The Parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance, or breach of this Agreement shall, if Purchaser so elects, be instituted in the United States District Court for the District of Utah, the Second District Court for the State of Utah, or any other judicial forum located within the state of Utah (the "<u>Acceptable Forums</u>"). Each Party agrees that the Acceptable Forums are convenient to it, and each Party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound

by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Utah or otherwise in those courts in any such suit, action or proceeding. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

20. **Attorneys Fees.** Seller agrees to reimburse Purchaser on demand for: (i) the actual amount of all costs and expenses, including all costs of court, attorneys' fees, witness fees, expert fees, and other costs and fees which Purchaser has incurred or may incur in: (a) negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith, all of which shall be paid contemporaneously with the execution hereof, (b) any way arising out of this Agreement, and (c) protecting, preserving or enforcing any lien, security interest or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claim; (ii) the actual costs, including photocopying (which if performed by Purchaser's employees shall be at the rate of $.25/page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Seller is a party; and (iii) the actual amount of all costs and expenses, including attorney's fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (1) arising out of the automatic stay, (2) contesting dischargeability or seeking dismissal or conversion of the bankruptcy proceeding or (3) opposing confirmation of Seller's plan thereunder. Any such costs and expenses incurred subsequent to the execution hereof shall become part of the Obligations when incurred and may be added to the outstanding principal amount due hereunder. Notwithstanding the existence of any law, statute or rule, in any jurisdiction which may provide Seller with a right to attorneys' fees or costs, Seller hereby waives any and all rights to hereafter seek attorneys' fees or costs hereunder and Seller agrees that Purchaser exclusively shall be entitled to indemnification and recovery of any and all attorney's fees and costs in respect to any litigation based hereon, arising out of, or related hereto, whether under, or in connection with, this and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either Party.

21. **Jury Trial Waiver.** IN RECOGNITION OF THE HIGHER COSTS AND DELAYS WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING HEREUNDER, OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY; AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHTS TO TRIAL BY JURY.

22. **Miscellaneous.** Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given orally (even if supported by new consideration), but only by an instrument in writing signed by all Parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any termination or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form reasonably satisfactory to Purchaser. Seller understands that this provision constitutes a waiver of its rights under Sections of Article 9 of the UCC.

Unless otherwise expressly stated in any other agreement between the Parties, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control. All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory. In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

This Agreement and all agreements relating to the subject matter hereof are the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly. The relationship of the Parties hereto shall be that of seller and purchaser of accounts, and neither party is or shall be deemed a fiduciary of or to the other.

All exhibits referenced in this Agreement are expressly incorporated herein by this reference. This Agreement, the documents or instruments referred to herein and all subsequent amendments, modifications or substitutions, embody the entire agreement and understanding of the parties hereto with respect to the subject matter herein. No promises of any kind have been made by Purchaser or any third party and Seller has not relied upon any promises, representations, warranties (either express or implied), agreements, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement shall supersede all prior agreements and understandings between the parties with respect to such subject matter hereof and no course of dealing, course of performance or trade usage, and no parol evidence of any nature, shall be used to supplement or modify any terms of this Agreement. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

This Agreement is not assignable or transferable by Seller and any such purported assignment or transfer is void. This Agreement shall be binding upon the successors of Seller, including any and all successor Persons. Purchaser is hereby authorized to file UCC financing statements against any such successor, and Seller shall hold Purchaser harmless from any loss or liability resulting from or arising out of Purchaser's actions against said successors. Purchaser is also authorized to contact any lender or factor of the successor Person. Seller acknowledges and agrees that Purchaser may assign all or any portion of this Agreement including, without limitation, assignment of the rights, benefits and remedies of Purchaser hereunder without any assignment of the duties, obligations or liabilities of Purchaser hereunder.

**23. <u>Notice</u>.** All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, (ii) transmittal by electronic means, including facsimile, to a receiver under the control of such party, or (iii) actual receipt by such party or an employee or agent of such party. All notices required to be given to Purchaser hereunder shall be deemed given upon actual receipt of certified mail by the officer of Purchaser set forth below, or his successor.

For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such Party may in writing hereafter indicate:

Seller: Coastal International, Inc.
Coastal International Holdings, LLC
Coastal International Trade Show Services, LLC
Address: 3 Harbor Drive, Suite 211
Sausalito, CA 94965
Attn: Bruce E. Green
Fax: (415) 339-1710

Purchaser: TAB Bank
Address: 4185 Harrison Blvd., Ste. 200
Ogden, Utah 84403
Attn: V.P. A/R Finance Operations
Fax: (801) 624-5309

[Signature page below]

The Parties, by their duly authorized representatives, hereby execute this Agreement.

**SELLER:**
Coastal International, Inc.

Bruce E. Green

Name: Bruce E. Green
Title: President

STATE OF California )
) ss.
COUNTY OF Marin )

On this 23 day of MArch 2016, before me, the undersigned notary, personally appeared Bruce E. Green, who being by me duly sworn did state, that he/she is the President of Coastal International, Inc., the corporation that executed the within instrument, and acknowledged to me that such corporation executed the same and that he/she was authorized to execute said instrument.

WITNESS my hand and official seal.

DULCE FRANCELY TAFOLLA-RIOS
COMM. # 2137936
NOTARY PUBLIC-CALIFORNIA
MARIN COUNTY
MY COMM. EXP. DEC. 21, 2019

Dulce Francely Tafolla-Rios
Notary Public

My Commission Expires: 12.21.2019

Residing At: Sausalito, CA

[Coastal International Holdings, LLC signature page below]

AR FORM 7.5: v2 020315

The Parties, by their duly authorized representatives, hereby execute this Agreement.

**SELLER:**
Coastal International Holdings, LLC

Bruce E. Green

Name: Bruce E. Green
Title: Manager

STATE OF California )
) ss.
COUNTY OF Marin )

On this 23 day of March 2016, before me, the undersigned notary, personally appeared Bruce E. Green, who being by me duly sworn did state, that he/she is the Manager of Coastal International Holdings, LLC, the limited liability company that executed the within instrument, and acknowledged to me that such limited liability company executed the same and that he/she was authorized to execute said instrument.

WITNESS my hand and official seal.

DULCE FRANCELY TAFOLLA-RIOS
COMM. # 2137936
NOTARY PUBLIC-CALIFORNIA
MARIN COUNTY
MY COMM. EXP. DEC. 21, 2019

Dulce Francely Tafolla Rios
Notary Public

My Commission Expires: 12.21.2019

Residing At: Sausalito, CA

[Coastal International Trade Show Services, LLC signature page below]

The Parties, by their duly authorized representatives, hereby execute this Agreement.

**SELLER:**
Coastal International Trade Show Services, LLC

Name: Bruce E. Green
Title: Manager

STATE OF California )
) ss.
COUNTY OF Marin )

On this 23 day of March 2016, before me, the undersigned notary, personally appeared Bruce E. Green, who being by me duly sworn did state, that he/she is the Manager of Coastal International Trade Show Services, LLC, the limited liability company that executed the within instrument, and acknowledged to me that such limited liability company executed the same and that he/she was authorized to execute said instrument.

WITNESS my hand and official seal.

DULCE FRANCELY TAFOLLA-RIOS
COMM. # 2137936
NOTARY PUBLIC-CALIFORNIA
MARIN COUNTY
MY COMM. EXP. DEC. 21, 2019

Notary Public

My Commission Expires: 12·21·2019

Residing At: Sausalito, CA

**PURCHASER:**
TAB Bank

Name: Tyler Heap
Title: VP
Date: 3/24/16

# EXHIBIT A

- **Administration Discount:**

| Number of Days from Purchase Date to Date Account is Closed | Total Discount Percentage |
|---|---|
| 01 to 90 days | 0.010% per diem |
| 90+ days | 0.15% per diem |

**Discount Fee Rate:** Seller shall pay interest to Purchaser on the outstanding Obligations of the Agreement at a variable per annum rate equal to the LIBOR Rate plus 4.5000%. As of the date hereof, LIBOR Rate is 0.6156%, therefore the corresponding Discount Fee Rate is 5.1156% per annum, with a per diem rate of 0.0142% (5.1156% divided by 360 days). Notwithstanding the foregoing, at no time shall the LIBOR Rate applicable to calculating the Discount Fee Rate be less than 0.3900%.

**LIBOR Rate**: For purposes of this Agreement, the term ***"LIBOR Rate"*** shall mean the rate of interest quotations for the ninety *(90) day London InterBank Offered Rate,* as published by the *Wall Street Journal,* commonly known as the "90 day LIBOR Rate" or "Three-Month LIBOR Rate", or, if no longer provided or published by the *Wall Street Journal*, such rate as shall be determined in good faith by Purchaser from such sources as Purchaser shall determine to be comparable to the Wall Street Journal. Each change in the LIBOR Rate contemplated hereunder shall take place automatically, without further notice, and shall be conclusive absent manifest error. Any change in the LIBOR Rate shall be effective as of the first business day following such adjustment, and such adjusted LIBOR Rate shall be the applicable LIBOR Rate thereafter used in the calculation of interest payable hereunder.

| | |
|---|---|
| Maximum Amount: | $3,000,000.00 |
| Origination Fee Percentage: | 0.00% |
| Annual Fee Percentage: | 0.00% |
| Minimum Monthly Fee: | 0.25% |
| Advance Percentage: | 85% |
| Reserve Percentage: | 15% |
| Term of Agreement: | 24 Months |
| Guarantors: | Bruce E. Green |
| Exclusions: | Any and all Account receivables generated in the course of business related to or associated with the construction industry.<br>Any and all pre-billed or progress-billed Account receivables which are generated based upon a percentage of completion or a progress billing calculation. |

**SELLER:**

Coastal International, Inc.

Bruce E. Green

Name: Bruce E. Green
Title: President

Coastal International Trade Show Services, LLC

Bruce E. Green

Name: Bruce E. Green
Title: Manager

Coastal International Holdings, LLC

Bruce E. Green

Name: Bruce E. Green
Title: Manager

AR FORM 7.5: v2 020315

**ADDENDUM TO THE**
**ACCOUNTS RECEIVABLE PURCHASE AND SECURITY AGREEMENT**

This Addendum to the Accounts Receivable Purchase and Security Agreement (the "Addendum") is between Transportation Alliance Bank Inc. dba TAB Bank ("Purchaser"), and Coastal International, Inc., Coastal International Holdings, LLC and Coastal International Trade Show Services, LLC (individually and collectively, the "Seller").

A. The parties desire to amend certain provisions in the Accounts Receivable Purchase and Security Agreement (the "Agreement"), and

B. The parties intend to supplement or modify the Agreement only to the extent set forth in this Addendum, and in all other respects, the parties desire that the Agreement remain in full force and effect as written.

The parties therefore agree as follows:

1. **Definitions.**

Capitalized terms used in this Addendum which are defined in the Agreement shall have the same meanings as defined therein, unless otherwise defined herein.

2. **Modifications.**

(a) The following definition is deleted from the Agreement as follows:

"Balance Subject to Discount Fee" – the cumulative unpaid balance of the Purchase Price of all outstanding and unclosed Purchased Accounts minus the balance in the Reserve Account.

(b) The following definition is added to the Agreement as follows:

"Funds Employed" means the cumulative uncollected balance of the Purchase Price of all outstanding Purchased Accounts (which are not Closed) minus the balance in the Reserve Account.

(c) The following definitions are amended and restated in the Agreement as follows:

"Discount Fee Rate" – means the Discount Fee Rate specified on Exhibit A, which accrues on the Funds Employed on a per diem basis. Purchaser may change the Discount Fee Rate applicable to existing or future Purchased Accounts at any time, after giving Seller thirty (30) days prior written notice.

"Early Termination Fee" – an amount equal to the Minimum Monthly Fee multiplied by the number of months (prorated for partial months) by which the termination date requested by Seller precedes the termination date of this Agreement as set forth in Section 18 hereof. In the event the early termination date exceeds twelve (12) months of the initial term, and (a) the Seller submits to Purchaser sufficient evidence the Seller has secured a firm commitment for a traditional line of credit from a competing FDIC insured institution, and (b) Purchaser is unwilling or unable to match the competing offer, the Early Termination Fee will be waived.

"Maximum Amount" – means the maximum amount of Funds Employed specified on Exhibit A attached hereto, or such other amount as Purchaser shall deem appropriate in its sole discretion.

"Notation" – "This account has been assigned and is payable to Transportation Alliance Bank Inc. dba TAB Bank. To the extent that you are now indebted, or may in the future become indebted to the Seller on any account or general intangible, payment thereof should be made payable to Seller, and sent to TAB Bank, P.O. Box 150412, Ogden, Utah 84415-0412."

(d) The following subsections in Section 4 of the Agreement are amended and restated as follows:

Sale. Seller shall offer to sell to Purchaser as absolute owner, such of Seller's Accounts as are listed from time to time on Schedules of Accounts. Each such Schedule of Accounts shall be

accompanied by such documentation supporting, validating, and evidencing the listed Accounts as Purchaser shall from time to time request. Purchaser may purchase any Account if, before and after such purchase, the Funds Employed equals or exceeds the Maximum Amount. However, Purchaser may change the Maximum Amount, either temporarily or permanently, to accommodate the purchase of any Eligible Account, as Purchaser deems desirable in its sole discretion. Purchaser's purchase of Eligible Accounts is at its sole discretion, and Purchaser shall have no obligation to purchase any Account, Eligible or otherwise, from Seller. Purchaser may decline to purchase any Account submitted by Seller for any reason or for no reason, without notice, regardless of any course of conduct or past purchase of Accounts by Purchaser.

**Purchase Price.** At the request of Seller, Purchaser shall pay all or any portion of the Purchase Price, less any amounts due to Purchaser from Seller (including, without limitation, any Reserve Shortfall, any Administration Fees, and less any other fees and costs provided for in this Agreement) at the Discount Fee Rate, on the Funds Employed that has accrued but has not yet been paid to Seller, of any Purchased Account, from time to time to Seller's Account. Any portion of the Purchase Price that Seller has not requested to be paid to Seller's Account, shall be held in the Seller's Reserve Account. Upon payment of all or any portion of the Purchase Price to Seller's Account or to Seller's Reserve Account, the Account shall be deemed purchased hereunder.

(e) Section 7(i) of the Agreement is amended and restated as follows:

(i) discount fees, at the Discount Fee Rate, from the applicable Purchase Date on the Funds Employed on a monthly basis on the last Business Day of the calendar month in which it accrues;

(f) The following paragraph in the Exhibit A is amended and restated in the Agreement as follows:

**Discount Fee Rate:** Seller shall pay interest to Purchaser on the Funds Employed at a variable per annum rate equal to the LIBOR Rate plus 4.5000%. As of the date hereof, LIBOR Rate is 0.6156%, therefore the corresponding Discount Fee Rate is 5.1156% per annum, with a per diem rate of 0.0142% (5.1156% divided by 360 days). Notwithstanding the foregoing, at no time shall the LIBOR Rate applicable to calculating the Discount Fee Rate be less than 0.3900%.

3. **Default.**

Upon any Event of Default by Seller, in addition to any other rights, remedies, powers, or privileges set forth in the Agreement, Purchaser may, in its discretion, strictly adhere to the provisions of the Agreement as written.

4. **Legal Effect.**

This Addendum is intended to supplement and modify the Agreement. The parties ratify the Agreement, as amended by this Addendum, and the Agreement remains in full force and effect. In the event of a conflict between this Addendum and the Agreement, this Addendum prevails. This Addendum is effective when all the parties hereto have signed it.

5. **Counterparts.**

This Addendum may be executed in as many counterparts as may be deemed necessary or convenient each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one of the same Addendum. Delivery of an executed counterpart of this Addendum by facsimile, PDF, or other means is effective as delivery of an originally executed counterpart of this Addendum, and any party delivering such an executed counterpart by facsimile, PDF, or other means shall thereafter also promptly deliver an originally executed counterpart of this Addendum to such other party, provided that the failure to deliver such an originally executed counterpart shall not affect the validity, enforceability, or binding effect of this Addendum.

[Coastal International, Inc. signature page below]

The Parties, by their duly authorized representatives, hereby execute this Agreement.

**SELLER:**
Coastal International, Inc.

Bruce E. Green

Name: Bruce E. Green
Title: President

STATE OF California )
) ss.
COUNTY OF Marin )

On this 23 day of March, 2016, before me, the undersigned notary, personally appeared Bruce E. Green, who being by me duly sworn did state, that he/she is the President of Coastal International, Inc., the corporation that executed the within instrument, and acknowledged to me that such corporation executed the same and that he/she was authorized to execute said instrument.

WITNESS my hand and official seal.

Notary Public

My Commission Expires: 12-21-2019

Residing At: Sausalito, CA

[Coastal International Holdings, LLC signature page below]

The Parties, by their duly authorized representatives, hereby execute this Agreement.

**SELLER:**
Coastal International Holdings, LLC

Bruce E. Green

Name: Bruce E. Green
Title: Manager

STATE OF California )
) ss.
COUNTY OF Marin )

On this 23 day of March 2016, before me, the undersigned notary, personally appeared Bruce E. Green, who being by me duly sworn did state, that he/she is the Manager of Coastal International Holdings, LLC, the limited liability company that executed the within instrument, and acknowledged to me that such limited liability company executed the same and that he/she was authorized to execute said instrument.

WITNESS my hand and official seal.

DULCE FRANCELY TAFOLLA-RIOS
COMM. # 2137936
NOTARY PUBLIC-CALIFORNIA
MARIN COUNTY
MY COMM. EXP. DEC. 21, 2019

Dulce Francely Tafolla Rios
Notary Public

My Commission Expires: 12·21·2019

Residing At: Sausalito, CA

[Coastal International Trade Show Services, LLC signature page below]

The Parties, by their duly authorized representatives, hereby execute this Agreement.

**SELLER:**
Coastal International Trade Show Services, LLC

Bruce E. Green
Name: Bruce E. Green
Title: Manager

STATE OF California )
) ss.
COUNTY OF Marin )

On this 23 day of March 2016, before me, the undersigned notary, personally appeared Bruce E. Green, who being by me duly sworn did state, that he/she is the Manager of Coastal International Trade Show Services, LLC, the limited liability company that executed the within instrument, and acknowledged to me that such limited liability company executed the same and that he/she was authorized to execute said instrument.

WITNESS my hand and official seal.

DULCE FRANCELY TAFOLLA-RIOS
COMM. # 2137936
NOTARY PUBLIC-CALIFORNIA
MARIN COUNTY
MY COMM. EXP. DEC. 21, 2019

Dulce Francely Tafolla Rios
Notary Public

My Commission Expires: 12-21-2019

Residing At: Sausalito, CA

**PURCHASER:**
TAB Bank

Tyler Heap
Name: Tyler Heap
Title: VP
Date: 3/24/16

AR FORM 7.5: v2 020315

# CERTIFIED COPY OF RESOLUTIONS

**RESOLVED**, that the Accounts Receivable Purchase and Security Agreement (the "Agreement"), dated February 3, 2016, entered into by and between Coastal International Trade Show Services, LLC ("Company") and Transportation Alliance Bank Inc. dba TAB Bank ("TAB"), and all other agreements and documents connected therewith be, and the same hereby are, approved on the terms and conditions as set forth therein;

**RESOLVED FURTHER**, that any officer/owner/partner/manager/President/agent of Company or her/his designees, be, and she/he hereby is, authorized and directed to enter into said Agreement and all other agreements and documents, including but not limited to, granting security interests connected therewith and to execute the same for and on behalf of Company on the terms and conditions set forth therein;

**RESOLVED FURTHER**, that any officer/owner/partner/manager/President/agent of Company, or her/his designee, be, and she/he hereby is, authorized and directed to negotiate, agree upon, execute and deliver, from time to time, in the name of, and on behalf of Company, such agreements, amendments and supplements to said Agreement or any other agreement or document connected therewith, and all other documents, instruments, certificates, notices and further assurances, and to perform any and all such acts and things as may be required by TAB in connection with said Agreement or any other agreement or document connected therewith, or that may to her/him seem necessary or proper to implement and effectuate the complete consummation of said Agreement or any other agreement or document connected therewith in all respects and for the purposes set forth in these resolutions;

**RESOLVED FURTHER**, that these resolutions shall remain in full force and effect until written notice of their amendment or repeal shall be received by TAB in writing, and until all indebtedness and obligations arising out of said Agreement and all other agreements and documents connected therewith shall have been paid and satisfied in full;

The undersigned, acting as the duly elected and qualified Manager of Company, does hereby certify that the foregoing is a true and correct copy of the resolutions duly adopted at a meeting of the Board of directors/owners/partners/managers/Presidents/governing body of Company, duly called, noticed and held on February 3, 2016, at which meeting there was at all times present and acting, at least, the minimum number of Presidents of said Board of directors/owners/partners/managers/Presidents/governing body as are required by law and by the Articles of Incorporation/By-laws/Proprietorship Agreement/Partnership Agreement/Articles of Organization/other governing documents of the Company to bind the Company; that said resolutions are in full force and effect; and that the following is a true and correct list of the present officers/owners/partners/managers/Presidents/agents of Company that may obligate and otherwise bind, or whose designee may obligate and otherwise bind Coastal International Trade Show Services, LLC:

**Officers/Owners/Partners/Managers/Presidents/Agents:**

| Name | Title |
| --- | --- |
| Bruce E. Green | Manager |

**IN WITNESS WHEREOF**, the undersigned has executed this Certified Copy of Resolutions, as of the day and date set forth below.

**Coastal International Trade Show Services, LLC**

Bruce E. Green

Name: Bruce E. Green, Manager
Date: February 3, 2016

AR FORM 7.5: v2 020315

# CERTIFIED COPY OF RESOLUTIONS

**RESOLVED**, that the Accounts Receivable Purchase and Security Agreement (the "Agreement"), dated February 3, 2016, entered into by and between Coastal International Holdings, LLC ("Company") and Transportation Alliance Bank Inc. dba TAB Bank ("TAB"), and all other agreements and documents connected therewith be, and the same hereby are, approved on the terms and conditions as set forth therein;

**RESOLVED FURTHER**, that any officer/owner/partner/manager/President/agent of Company or her/his designees, be, and she/he hereby is, authorized and directed to enter into said Agreement and all other agreements and documents, including but not limited to, granting security interests connected therewith and to execute the same for and on behalf of Company on the terms and conditions set forth therein;

**RESOLVED FURTHER**, that any officer/owner/partner/manager/President/agent of Company, or her/his designee, be, and she/he hereby is, authorized and directed to negotiate, agree upon, execute and deliver, from time to time, in the name of, and on behalf of Company, such agreements, amendments and supplements to said Agreement or any other agreement or document connected therewith, and all other documents, instruments, certificates, notices and further assurances, and to perform any and all such acts and things as may be required by TAB in connection with said Agreement or any other agreement or document connected therewith, or that may to her/him seem necessary or proper to implement and effectuate the complete consummation of said Agreement or any other agreement or document connected therewith in all respects and for the purposes set forth in these resolutions;

**RESOLVED FURTHER**, that these resolutions shall remain in full force and effect until written notice of their amendment or repeal shall be received by TAB in writing, and until all indebtedness and obligations arising out of said Agreement and all other agreements and documents connected therewith shall have been paid and satisfied in full;

The undersigned, acting as the duly elected and qualified Manager of Company, does hereby certify that the foregoing is a true and correct copy of the resolutions duly adopted at a meeting of the Board of directors/owners/partners/managers/Presidents/governing body of Company, duly called, noticed and held on February 3, 2016, at which meeting there was at all times present and acting, at least, the minimum number of Presidents of said Board of directors/owners/partners/managers/Presidents/governing body as are required by law and by the Articles of Incorporation/By-laws/Proprietorship Agreement/Partnership Agreement/Articles of Organization/other governing documents of the Company to bind the Company; that said resolutions are in full force and effect; and that the following is a true and correct list of the present officers/owners/partners/managers/Presidents/agents of Company that may obligate and otherwise bind, or whose designee may obligate and otherwise bind Coastal International Holdings, LLC:

**Officers/Owners/Partners/Managers/Presidents/Agents:**

| Name | Title |
|---|---|
| Bruce E. Green | Manager |

**IN WITNESS WHEREOF**, the undersigned has executed this Certified Copy of Resolutions, as of the day and date set forth below.

**Coastal International Holdings, LLC**

Bruce E. Green

Name: Bruce E. Green, Manager
Date: February 3, 2016

AR FORM 7.5: v2 020315

## CERTIFIED COPY OF RESOLUTIONS

**RESOLVED**, that the Accounts Receivable Purchase and Security Agreement (the "Agreement"), dated February 3, 2016, entered into by and between Coastal International, Inc. ("Company") and Transportation Alliance Bank Inc. dba TAB Bank ("TAB"), and all other agreements and documents connected therewith be, and the same hereby are, approved on the terms and conditions as set forth therein;

**RESOLVED FURTHER**, that any officer/owner/partner/manager/President/agent of Company or her/his designees, be, and she/he hereby is, authorized and directed to enter into said Agreement and all other agreements and documents, including but not limited to, granting security interests connected therewith and to execute the same for and on behalf of Company on the terms and conditions set forth therein;

**RESOLVED FURTHER**, that any officer/owner/partner/manager/President/agent of Company, or her/his designee, be, and she/he hereby is, authorized and directed to negotiate, agree upon, execute and deliver, from time to time, in the name of, and on behalf of Company, such agreements, amendments and supplements to said Agreement or any other agreement or document connected therewith, and all other documents, instruments, certificates, notices and further assurances, and to perform any and all such acts and things as may be required by TAB in connection with said Agreement or any other agreement or document connected therewith, or that may to her/him seem necessary or proper to implement and effectuate the complete consummation of said Agreement or any other agreement or document connected therewith in all respects and for the purposes set forth in these resolutions;

**RESOLVED FURTHER**, that these resolutions shall remain in full force and effect until written notice of their amendment or repeal shall be received by TAB in writing, and until all indebtedness and obligations arising out of said Agreement and all other agreements and documents connected therewith shall have been paid and satisfied in full;

The undersigned, acting as the duly elected and qualified President of Company, does hereby certify that the foregoing is a true and correct copy of the resolutions duly adopted at a meeting of the Board of directors/owners/partners/managers/Presidents/governing body of Company, duly called, noticed and held on February 3, 2016, at which meeting there was at all times present and acting, at least, the minimum number of Presidents of said Board of directors/owners/partners/managers/Presidents/governing body as are required by law and by the Articles of Incorporation/By-laws/Proprietorship Agreement/Partnership Agreement/Articles of Organization/other governing documents of the Company to bind the Company; that said resolutions are in full force and effect; and that the following is a true and correct list of the present officers/owners/partners/managers/Presidents/agents of Company that may obligate and otherwise bind, or whose designee may obligate and otherwise bind Coastal International, Inc. :

**Officers/Owners/Partners/Managers/Presidents/Agents:**

| Name | Title |
| --- | --- |
| Bruce E. Green | President |

**IN WITNESS WHEREOF**, the undersigned has executed this Certified Copy of Resolutions, as of the day and date set forth below.

**Coastal International, Inc.**

Bruce E. Green

Name: Bruce E. Green, President
Date: February 3, 2016

AR FORM 7.5: v2 020315

**CONTINUING GUARANTY AND WAIVER**

1. In order to induce Transportation Alliance Bank Inc. dba TAB Bank ("TAB") to enter into that certain Accounts Receivable Purchase and Security Agreement ("Agreement"), dated February 3, 2016 with Coastal International, Inc., Coastal International Holdings, LLC and Coastal International Trade Show Services, LLC (individually and collectively, the "Customer"), and for other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned ("Guarantors") and each of them do hereby jointly and severally unconditionally guarantee to TAB, or order, its successors and assigns, the due payment in lawful money of the United States, and full prompt and faithful performance by Customer of all moneys to be paid, and all things to be done, pursuant to each and every condition, warranty, representation and covenant contained in the Agreement, or in any supplement or amendment thereto, or in any written instrument given in pursuance thereof, as well as the due payment and performance of all other debts and obligations which said Customer may now or at any time hereafter owe to TAB.

2. Guarantors hereby agree: (i) this is a continuing guaranty relating to any indebtedness, including that arising under successive transactions which shall either continue the indebtedness or from time to time renew it after it has been satisfied; (ii) that this Continuing Guaranty and Waiver (the "Guaranty") shall not be impaired by any modification to which the parties to said Agreement may hereafter agree, nor by any modification, release or other alteration of any of the obligations hereby guaranteed or of any security thereof, to all of which the undersigned hereby consent; (iii) that their liability hereunder is direct and unconditional, and may be enforced without requiring TAB to first resort to any other right, remedy or security; (iv) that this Guaranty shall continue in force until TAB shall receive written notice by registered or certified mail revoking it as to future transactions, in which case this Guaranty shall only apply to transactions undertaken or obligations incurred prior to the receipt of such notice; and (v) to pay all attorney's fees and all other costs and expenses which may be incurred by TAB in the enforcement of this Guaranty or any of the covenants or conditions hereof.

3. Upon (i) any default in payment or performance of any indebtedness, instrument or other obligation hereby guaranteed; (ii) the death, dissolution, insolvency, or business failure, or any assignment for benefit of creditors by, or commencement of any bankruptcy, moratorium or debt relief proceeding by or against Guarantors, or any of them; or (iii) the appointment of a receiver for, or any attachment, distraint of or making or levying of any order of court or legal process affecting the property of Guarantors or any of them, then, or at any time thereafter, at TAB's option, any or all indebtedness, instruments and other obligations hereby guaranteed shall become, for the purpose of the guaranty, due and payable by Guarantors forthwith without demand or notice.

4. All demands, presentments, notices of protest and of dishonor and notices of every kind or nature are expressly waived by the undersigned. The undersigned hereby waive the right to require TAB to proceed against the Customer, the Account Debtor (as defined in the Agreement), or any other party or to proceed against or apply any security it may hold and agrees that TAB may proceed against the undersigned for the amount hereby guaranteed. The undersigned waive the right to plead any and all statutes of limitations as a defense to this Guaranty and to any indebtedness or liability hereby guaranteed, and agree that any partial payments by or on behalf of the undersigned on any indebtedness or liability hereby guaranteed, including interest, shall, as of the time each such payment is made, stop the running of the time within which an action may be commenced upon this Guaranty, and shall constitute a further waiver by the undersigned of the right to plead any and all statutes of limitations as a defense to this Guaranty and to any indebtedness of liability hereby guaranteed.

5. All debts and liabilities, present and future, of Customer to the undersigned, or any of them, are hereby postponed and subordinated to the liabilities of Customer to TAB, and all moneys received by any of the undersigned or their representatives, successors or assigns thereon, shall be received as trustees for TAB and shall be paid over to TAB; and the undersigned and each of them further agrees, upon any liquidation or distribution of the assets of Customer, to assign to TAB upon its request all claims on account of all such debts and liabilities and that TAB shall receive all dividends and payments on such debts and liabilities until payment in full of all liabilities of Customer to TAB; and this agreement shall constitute such assignment in the event the undersigned shall fail or refuse to execute and deliver such other or further assignment of such claims as TAB may request.

6. Where the Customer is a corporation, limited liability company, partnership, trust, or other association, TAB shall not be required to verify or inquire into the powers or authority (or lack thereof) of the Customer or its directors, officers, partners, associates, Presidents, managers, trustees or other agents or purporting to act on its behalf, the undersigned hereby representing that such powers and authority exist and are sufficient, and TAB's reliance thereon shall be deemed unconditionally justified, and moneys in fact received from TAB in the professed exercise of such powers and authority shall be deemed to form part of the liabilities guaranteed, even though the obtaining of such moneys may be in excess of the actual powers or authority of the Customer or of the directors, officers, partners, associates, Presidents, managers, trustees or other agents thereof, or shall be in any way irregular or defective or informal..

7. When the Customer is a partnership or other association, this Guaranty is to extend to the person or persons for the time being and from time to time carrying on the business now conducted by the Customer, notwithstanding any change or changes in the name or Presidentship of the Customer's firm.

8. Each married person who executes this Guaranty hereby agrees and expressly assents to the liability of their separate property for any and all obligations hereunder.

9. By executing this Guaranty, the Guarantors hereby authorize TAB to: request, receive, and verify credit reports and any other financial information regarding each of the Guarantors that TAB deems necessary and appropriate to the transaction contemplated herein; that TAB is authorized to inquire of, investigate, confirm, and verify any information contained in any documents, schedules, reports, statements, and/or other information provided, directly or indirectly, by Customer and/or each of the Guarantors in connection with this Guaranty and the Agreement, or learned by TAB as part of its investigation and review of the transaction contemplated herein, the Guaranty and/or the Agreement.

10. The undersigned agrees to pay a reasonable attorney's fee and all other costs and expenses which may be incurred by TAB in connection with this Guaranty or in the collection of any of said indebtedness or liabilities from the Customer or the undersigned.

11. This Guaranty shall inure to the benefit of and bind the heirs, administrators, executors, successors and assigns of TAB and each of the undersigned, and shall be construed as the joint and several obligation of each of the undersigned where there is more than one. In all cases where there is but a single Customer or Guarantor, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Customer or Guarantor named herein, the words Customer and Guarantor, respectively, shall mean all and any one or more of them.

12. Guarantors hereby represent and warrant that (i) it is in Guarantors' direct interest to assist Customer because of Guarantors' interest in and relationship with Customer; (ii) this Guaranty constitutes the binding obligation of Guarantors, enforceable in accordance with its terms; and (iii) the execution and delivery of this Guaranty does not violate or constitute a default under (with or without the giving of notice, the passage of time, or both) any order, judgment, decree, instrument or agreement to which Guarantors are a party or by which they or their assets are affected or bound. As collateral securing Guarantors contingent obligations to TAB hereunder, Guarantors hereby grant to TAB a security interest in, to and under all assets of Guarantors, including all accounts, inventory, equipment, and general intangibles, and the proceeds thereof; and hereby authorize TAB to file against Guarantors in favor of TAB financing statements, including but not limited to UCC-1 forms, evidencing the security interest granted to TAB herein.

13. This Guaranty and all acts and transactions hereunder and all rights of the parties hereto shall be governed as to their validity, interpretation, construction, effect and in all respects by the laws of the State of Utah.

14. The Parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Guaranty shall, if TAB so elects, be instituted in the United States District Court for the District of Utah, or in the Second District Court for the State of Utah (the "Acceptable Forums"), each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Guaranty, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Utah or otherwise in those courts in any such suit, action or proceeding. Should such proceeding be initiated in any other forum, Guarantors waive any right to oppose any motion or application made by TAB as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

The undersigned executes this Continuing Guaranty and Waiver Agreement as of the date set forth below.

GUARANTOR:

Bruce E. Green

Bruce E. Green
February 3, 2016
16510 Arnold Drive
Sonoma CA, 95476

STATE OF California )
)§
COUNTY OF Marin )

On this 23 day of March, 2016, before me, the undersigned, personally appeared Bruce E. Green, and acknowledged the execution of this Continuing Guaranty and Waiver to be his/her voluntary act and deed.

WITNESS my hand and official seal.

Dulce Francely Tafolla-Rios
Notary Public

DULCE FRANCELY TAFOLLA-RIOS
COMM. # 2137936
NOTARY PUBLIC-CALIFORNIA
MARIN COUNTY
MY COMM. EXP. DEC. 21, 2019

My Commission Expires: 12.21.2019

Residing At: Sausalito, CA

AR FORM 7.5: v2 020315

# CERTIFICATION

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) That I am not subject to backup withholding either because; (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholdings as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. Citizen or other U.S. person.

**Certification Instructions:**
**Taxpayer Identification Number:** 46-4995456.

You must cross out item 2 if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

If you are subject to backup withholding, check this box ☐ and initial ________.

If you are not a U.S. Citizen or Resident Alien you must cross out Item 3 and complete and enclose a W-8BEN form.

The Internal Revenue Service does not require your consent to any provisions of this document other than the certifications required to avoid backup withholding.

**Politically exposed person** or **PEP** is a term that describes a person who may be or recently acted in the political arena of a country or has held a position in the recent past. Such an individual must be tracked by financial institutions as they pose potential reputational risk to regulated entities.

**Is any company officer, applicant, cardholder (driver), or guarantor a politically exposed person?** Yes ☐ No ☒

☐ **This Business is involved in the transportation/trucking industry.**
_____________ **ICC-FHWA or USDOT Number**

☒ **This Business IS NOT involved in the transportation/trucking industry.**
7389 **Primary Business or NAICS Code**

☐ **This Business is involved in Internet Gambling**

☒ **This Business IS NOT involved in Internet Gambling**

Certain transactions are prohibited from being processed through your credit card or other relationship with TAB Bank under the Unlawful Internet Gambling Enforcement Act of 2006 ("Act") and related regulations that have been issued by the Board of Governors of the Federal Reserve System and the United States Department Of The Treasury ("Regulation GG"). TAB Bank is also required by the Act and Regulation GG to inform its commercial customers of this restriction. The transactions which are prohibited are the following transactions or transmittals involving any credit, funds, instrument or proceeds that the Act prohibits any person engaged in the business of betting or wagering (except for the activities of a financial transaction provider, or any interactive computer service or telecommunications service) from knowingly accepting, in connection with the participation of another person in unlawful Internet Gambling: (1) Credit, or the proceeds of credit, extended to or on behalf of such person (including credit extended through the use of a credit card); (2) An electronic fund transfer, or funds transmitted by or through a money transmitting business, or the proceeds of an electronic fund transfer or money transmitting service, from or on behalf of such other person; (3) Any check, draft, or similar instrument that is drawn on or payable at or through any financial institution. Internet gambling will generally be deemed to be unlawful unless it is expressly authorized by license issued by an appropriate State or Tribal authority. Please let us know if you have any license issued by an appropriate State or Tribal authority. Please let us know if you have any questions.

| | |
|---|---|
| Company Name: | Coastal International Trade Show Services, LLC |
| Owner/Officer Signature: | Bruce E. Green |
| Name: | Bruce E. Green, Manager |
| Date: | February 3, 2016 |

AR FORM 7.5: v2 020315

## CERTIFICATION

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) That I am not subject to backup withholding either because; (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholdings as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. Citizen or other U.S. person.

**Certification Instructions:**
**Taxpayer Identification Number:** 46-4984478.

You must cross out item 2 if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

If you are subject to backup withholding, check this box ☐ and initial ________.

If you are not a U.S. Citizen or Resident Alien you must cross out Item 3 and complete and enclose a W-8BEN form.

The Internal Revenue Service does not require your consent to any provisions of this document other than the certifications required to avoid backup withholding.

**Politically exposed person** or **PEP** is a term that describes a person who may be or recently acted in the political arena of a country or has held a position in the recent past. Such an individual must be tracked by financial institutions as they pose potential reputational risk to regulated entities.

**Is any company officer, applicant, cardholder (driver), or guarantor a politically exposed person?** Yes ☐ No ☒

☐ **This Business is involved in the transportation/trucking industry.**
_____________ **ICC-FHWA or USDOT Number**

☒ **This Business IS NOT involved in the transportation/trucking industry.**
7389 **Primary Business or NAICS Code**

☐ **This Business is involved in Internet Gambling**

☒ **This Business IS NOT involved in Internet Gambling**

Certain transactions are prohibited from being processed through your credit card or other relationship with TAB Bank under the Unlawful Internet Gambling Enforcement Act of 2006 ("Act") and related regulations that have been issued by the Board of Governors of the Federal Reserve System and the United States Department Of The Treasury ("Regulation GG"). TAB Bank is also required by the Act and Regulation GG to inform its commercial customers of this restriction. The transactions which are prohibited are the following transactions or transmittals involving any credit, funds, instrument or proceeds that the Act prohibits any person engaged in the business of betting or wagering (except for the activities of a financial transaction provider, or any interactive computer service or telecommunications service) from knowingly accepting, in connection with the participation of another person in unlawful Internet Gambling: (1) Credit, or the proceeds of credit, extended to or on behalf of such person (including credit extended through the use of a credit card); (2) An electronic fund transfer, or funds transmitted by or through a money transmitting business, or the proceeds of an electronic fund transfer or money transmitting service, from or on behalf of such other person; (3) Any check, draft, or similar instrument that is drawn on or payable at or through any financial institution. Internet gambling will generally be deemed to be unlawful unless it is expressly authorized by license issued by an appropriate State or Tribal authority. Please let us know if you have any license issued by an appropriate State or Tribal authority. Please let us know if you have any questions.

| | |
|---|---|
| Company Name: | Coastal International Holdings, LLC |
| Owner/Officer Signature: | Bruce E. Green |
| Name: | Bruce E. Green, Manager |
| Date: | February 3, 2016 |

AR FORM 7.5: v2 020315

## CERTIFICATION

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) That I am not subject to backup withholding either because; (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholdings as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. Citizen or other U.S. person.

**Certification Instructions:**
**Taxpayer Identification Number:** 88-0205369.

You must cross out item 2 if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

If you are subject to backup withholding, check this box ☐ and initial ________.

If you are not a U.S. Citizen or Resident Alien you must cross out Item 3 and complete and enclose a W-8BEN form.

The Internal Revenue Service does not require your consent to any provisions of this document other than the certifications required to avoid backup withholding.

**Politically exposed person** or **PEP** is a term that describes a person who may be or recently acted in the political arena of a country or has held a position in the recent past. Such an individual must be tracked by financial institutions as they pose potential reputational risk to regulated entities.

**Is any company officer, applicant, cardholder (driver), or guarantor a politically exposed person?** Yes ☐ No ☒

☐ **This Business is involved in the transportation/trucking industry.**
_____________ **ICC-FHWA or USDOT Number**

☒ **This Business IS NOT involved in the transportation/trucking industry.**
7389 **Primary Business or NAICS Code**

☐ **This Business is involved in Internet Gambling**

☒ **This Business IS NOT involved in Internet Gambling**

Certain transactions are prohibited from being processed through your credit card or other relationship with TAB Bank under the Unlawful Internet Gambling Enforcement Act of 2006 ("Act") and related regulations that have been issued by the Board of Governors of the Federal Reserve System and the United States Department Of The Treasury ("Regulation GG"). TAB Bank is also required by the Act and Regulation GG to inform its commercial customers of this restriction. The transactions which are prohibited are the following transactions or transmittals involving any credit, funds, instrument or proceeds that the Act prohibits any person engaged in the business of betting or wagering (except for the activities of a financial transaction provider, or any interactive computer service or telecommunications service) from knowingly accepting, in connection with the participation of another person in unlawful Internet Gambling: (1) Credit, or the proceeds of credit, extended to or on behalf of such person (including credit extended through the use of a credit card); (2) An electronic fund transfer, or funds transmitted by or through a money transmitting business, or the proceeds of an electronic fund transfer or money transmitting service, from or on behalf of such other person; (3) Any check, draft, or similar instrument that is drawn on or payable at or through any financial institution. Internet gambling will generally be deemed to be unlawful unless it is expressly authorized by license issued by an appropriate State or Tribal authority. Please let us know if you have any license issued by an appropriate State or Tribal authority. Please let us know if you have any questions.

| | |
|---|---|
| Company Name: | Coastal International, Inc. |
| Owner/Officer Signature: | Bruce E. Green |
| Name: | Bruce E. Green, President |
| Date: | February 3, 2016 |

AR FORM 7.5: V2 020315

DocuSign Envelope ID: EA22B0BD-D7F1-4085-B16A-5F128A3C6041

# AMENDMENT NO. 01 TO THE ACCOUNTS RECEIVABLE PURCHASE AND SECURITY AGREEMENT

This Amendment No. 01 to Accounts Receivable Purchase and Security Agreement (the "Amendment") is between Transportation Alliance Bank Inc. dba TAB Bank ("Purchaser") and Coastal International, Inc., Coastal International Holdings, LLC and Coastal International Trade Show Services, LLC (individually and collectively, the "Seller").

A. Purchaser and Seller entered into that certain Accounts Receivable Purchase and Security Agreement ("Agreement"), dated February 3, 2016; and

B. Seller requested that Purchaser amend the Agreement to increase the Maximum Amount, the Late Payment Date, and the Advance Percentage, and to decrease the Administration Discount, the Reserve Percentage, and the Late Charge, and Purchaser desires to accommodate this request by Seller; and

C. Purchaser and Seller desire to amend the Agreement.

The parties therefore agree as follows:

1. **Definitions**. Capitalized terms not defined in this Amendment have the same meaning ascribed to them in the Agreement.

2. **Amendment**. The parties hereby amend the Agreement as follows:

(a) The following definitions in the Agreement are amended to read as follows:

"Late Charge" 0.08% per diem.

"Late Payment Date" the date which is one hundred (100) days from the Invoice date of a Purchased Account.

(b) The following terms set forth in the Exhibit A of the Agreement are amended to read as follows:

**Administration Discount**:

| **Number of Days from Purchase Date to Date Account is Closed** | **Total Discount Percentage** |
|---|---|
| 01 + days | 0.008% per diem |

Maximum Amount: $4,000,000.00

Advance Percentage: 90%

Reserve Percentage: 10%

3. **Amendment Fee**. Seller agrees to pay to Purchaser an amendment documentation fee equal to One Thousand Dollars ($1000.00) (the "Amendment Fee"), which Amendment Fee Purchaser may deduct from the Reserve Account or from future purchases of Accounts under the Agreement.

4. **Release and Waiver of Claims**. Seller for itself, its heirs, personal representatives, agents, employees, officers, shareholders, directors, successors and assigns hereby releases and forever discharges Purchaser, and Purchaser's parent, affiliates, subsidiaries, agents, employees, officers, shareholders, directors, successors and assigns, of and from any and all claims, liabilities, and damages of every type, kind, nature, description, or character, now existing or hereafter arising, known or unknown, liquidated or unliquidated, to the extent arising from or in any way related to the Agreement (as amended) entered into between Purchaser and Seller.

DocuSign Envelope ID: EA22B0BD-D7F1-4085-B16A-5F128A3C6041

5. **Legal Effect; Term**. This Amendment is intended to be a modification of the Agreement. The Agreement remains in full force and effect, except as amended by this Amendment. In the event of a conflict between this Amendment and the Agreement, this Amendment prevails. The parties agree that this Amendment is effective as of the date signed by Purchaser and that the term of the Agreement, as amended, continues until March 20, 2020, and further extends automatically for successive one (1) year periods, unless Seller delivers to Purchaser written notice of its intention to terminate at least ninty (90) days prior to March 20, 2020, or prior to the expiration of any renewal period thereafter, whereupon the Agreement terminates on said date. Upon termination Seller shall pay the Obligations to Purchaser.

6. **Counterparts**. This Amendment may be executed in as many counterparts as may be deemed necessary or convenient, each of which, when so executed, is an original but all of which constitute one and the same instrument. Seller may circulate to Purchaser an executed counterpart of this Amendment by fax, PDF, or other electronic means acceptable to Purchaser, but in addition Seller shall promptly deliver to Purchaser an originally executed counterpart of this Amendment. Failure to deliver an originally executed counterpart will not affect enforcement of the provisions of this Amendment.

The parties, by their duly authorized representatives, hereby execute this Amendment.

**SELLER:**

Coastal International, Inc.

DocuSigned by:
Bruce E. Green
F50BD06567AF4FB...

Name: Bruce E. Green
Title: President

Coastal International Trade Show Services, LLC

DocuSigned by:
Bruce E. Green
F50BD06567AF4FB...

Name: Bruce E. Green
Title: Manager

Coastal International Holdings, LLC

DocuSigned by:
Bruce E. Green
F50BD06567AF4FB...

Name: Bruce E. Green
Title: Manager

**PURCHASER**:

Transportation Alliance Bank Inc. dba TAB Bank

DocuSigned by:
Curtis Sutherland
EB2A7CC113024A6...

Name: Curtis Sutherland
Title: VP, AR Operations

Date: 4/26/2018 | 7:59 AM MDT

## ACKNOWLEDGMENT AND CONSENT OF GUARANTOR

The undersigned, and each of them, being a guarantor of Seller's payment and other performance of all obligations and duties owed to Transportation Alliance Bank Inc. dba TAB Bank pursuant to that certain Accounts Receivable Purchase and Security Agreement dated February 3, 2016, or in any amendment or supplement thereto as well as any and all other ancillary documents thereto, pursuant to the undersigned's Continuing Guaranty and Waiver, dated February 3, 2016 ("Guaranty"), hereby acknowledges the contents of the foregoing Amendment set forth above, and consents and agrees to be bound by the terms, conditions and execution of the above Amendment and hereby further agrees that the undersigned's obligations as set forth in the Guaranty shall be continuing as provided in said Guaranty, and said Guaranty shall remain as written originally and continue in full force and effect in all respects, including as to the contents of the Amendment set forth above.

**GUARANTOR:**

DocuSigned by:
Bruce E. Green
F50BD06567AF4FB...

Bruce E. Green, an individual

**Heather Mansfield**

**From:** Heather Mansfield
**Sent:** Thursday, April 26, 2018 8:11 AM
**To:** Heather Mansfield
**Subject:** FW: Coastal International BLC Approved FW: Message from "RNP002673BFDDB0"
**Attachments:** 20180423084354084.pdf; Coastal International - Amendment 1 - 042318.docx; Coastal International - Amendment 1 - 042318.pdf; Summary.pdf

**Importance:** High

**From:** DocuSign System [mailto:dse_na2@docusign.net]
**Sent:** Thursday, April 26, 2018 8:00 AM
**To:** Heather Mansfield <heather.mansfield@tabbank.com>
**Subject:** [EXTERNAL] Completed: Coastal International - Amendment 1 - 042318.pdf

All signers completed Coastal International - Amendment 1 - 042318.pdf

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
D1320E77D7024B24BEAD5A37E2A96A542

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Heather Mansfield who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

***From: Spencer Wicker***
***Sent: Tuesday, April 24, 2018 3:45 PM***
***To: Heather Mansfield <heather.mansfield@tabbank.com>***
***Subject: coastal contact***

***Bruce Green bruce.green@coastalintl.com***

***Thanks,***

***Spencer Wicker***
***Relationship Manager Supervisor***
***Direct Phone 801.624.5967***

***-----Original Message-----***
***From: Heather Mansfield***
***Sent: Monday, April 23, 2018 10:35 AM***
***To: Spencer Wicker <spencer.wicker@tabbank.com>; Nicole Jamieson <nicole.jamieson@tabbank.com>***
***Cc: Heather Mansfield <heather.mansfield@tabbank.com>***

***Subject: FW: Coastal International BLC Approved FW: Message from "RNP002673BFDDB0"***
***Importance: High***

***Hi Spencer,***

***Attached is the Amendment 1 for Coastal International. Please review & let me know if there are any changes. Also if we are sending this DocuSign I will need the email address for Bruce E. Green. =)***

***Thank You,***
***Heather J Mansfield***
***Legal Documentation Specialist***
***801.624.5975 Direct***

***-----Original Message-----***
***From: Spencer Wicker***
***Sent: Monday, April 23, 2018 8:46 AM***
***To: Heather Mansfield <heather.mansfield@tabbank.com>; Nicole Jamieson <nicole.jamieson@tabbank.com>***
***Cc: Vicky Uhl <vicky.uhl@tabbank.com>; Curtis Sutherland <curtis.sutherland@tabbank.com>; Erin Kennah <Erin.Kennah@tabbank.com>***
***Subject: Coastal International BLC Approved FW: Message from "RNP002673BFDDB0"***
***Importance: High***

***Hi Curtis,***

***Can you change the advance rate to 90% immediately, so we can get the schedules purchased at 90%?***

***Hi Erin or Vicky,***

***Can you update all the necessary items in Factorsoft?***

***Hi Heather,***

***Coastal International was approved in BLC on Friday. The following are changes we need in the amendment:***

***1) Amendment Fee of $1K***
***2) Facility Limit Increased to $4M***
***3) Recourse Change to 100 Days***
***4) Late fee 100 days at change to 0.08% per diem***
***5) Factoring Admin Fee change to 0.008% per diem***

***Contract is set to expire March 2019, we want to extend it to March 2020. If you need the original credit summary I can bring it down. LMK.***

***Thanks,***

***Spencer Wicker***
***Relationship Manager Supervisor***
***Direct Phone 801.624.5967***

***-----Original Message-----***
***From: admin@tabbank.com [mailto:admin@tabbank.com]***
***Sent: Monday, April 23, 2018 8:44 AM***
***To: Spencer Wicker <spencer.wicker@tabbank.com>***
***Subject: Message from "RNP002673BFDDB0"***

***This E-mail was sent from "RNP002673BFDDB0" (MP 6503).***

***Scan Date: 04.23.2018 08:43:54 (-0600)***
***Queries to: admin@tabbank.com***



## Certificate Of Completion

Envelope Id: EA22B0BDD7F14085B16A5F128A3C6041 | Status: Completed
Subject: Coastal International - Amendment 1 - 042318.pdf
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 2 | Signatures: 5 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Heather Mansfield |
| AutoNav: Enabled | | 4185 Harrison Blvd #200 |
| EnvelopeId Stamping: Enabled | | Ogden, UT 84403 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | heather.mansfield@tabbank.com |
| | | IP Address: 204.110.232.254 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>4/25/2018 6:54:22 AM | Holder: Heather Mansfield<br>heather.mansfield@tabbank.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Bruce E. Green<br>bruce.green@coastalintl.com<br>CEO<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Bruce E. Green<br>F50BD06567AF4FB...<br><br>Using IP Address: 50.232.236.211 | Sent: 4/25/2018 7:08:30 AM<br>Viewed: 4/26/2018 6:52:26 AM<br>Signed: 4/26/2018 6:53:26 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 4/26/2018 6:52:26 AM<br>Withdrawn: 4/26/2018 6:53:26 AM<br>ID: 0f03016a-4e93-4a60-859e-ef7556eeaafb | | |
| Curtis Sutherland<br>curtis.sutherland@tabbank.com<br>6/23/2017<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Curtis Sutherland<br>EB2A7CC113024A6...<br><br>Using IP Address: 204.110.232.254 | Sent: 4/26/2018 6:53:27 AM<br>Viewed: 4/26/2018 6:59:43 AM<br>Signed: 4/26/2018 6:59:49 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 6/27/2016 8:06:52 AM<br>ID: 95d763a7-a643-4783-87a4-c86e15d8566e | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Heather Mansfield<br>heather.mansfield@tabbank.com<br>Documentation Specialist<br>Transportation Alliance Bank Inc<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 4/26/2018 6:59:50 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| Carbon Copy Events | Status | Timestamp |
| --- | --- | --- |
| Jennifer Kotter<br>jennifer.kotter@tabbank.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 4/26/2018 6:59:50 AM |
| Nicole Jamieson<br>nicole.jamieson@tabbank.com<br>Document Team Lead<br>Transportation Alliance Bank Inc<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 4/26/2018 6:59:50 AM |
| Spencer Wicker<br>spencer.wicker@tabbank.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Accepted: 2/25/2015 3:36:30 PM<br>ID: 80d43cd0-19e2-4c03-a2ed-5bc9163887a7 | COPIED | Sent: 4/26/2018 6:59:50 AM |
| Vicky Uhl<br>vicky.uhl@tabbank.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 4/26/2018 6:59:50 AM |

| Notary Events | Signature | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 4/26/2018 6:59:50 AM |
| Certified Delivered | Security Checked | 4/26/2018 6:59:50 AM |
| Signing Complete | Security Checked | 4/26/2018 6:59:50 AM |
| Completed | Security Checked | 4/26/2018 6:59:50 AM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 2/3/2015 2:02:03 PM
Parties agreed to: Bruce E. Green, Curtis Sutherland, Spencer Wicker

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Transportation Alliance Bank Inc (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Transportation Alliance Bank Inc:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: LEGAL@TABBANK.COM

**To advise Transportation Alliance Bank Inc of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at LEGAL@TABBANK.COM and in the body of such request you must state: your previous e-mail address, your new e-mail address. .
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.
**To request paper copies from Transportation Alliance Bank Inc**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to LEGAL@TABBANK.COM and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Transportation Alliance Bank Inc**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
ii. send us an e-mail to LEGAL@TABBANK.COM and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. . The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| | |
|---|---|
| Operating Systems: | Windows2000? or WindowsXP? |
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.
**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Transportation Alliance Bank Inc as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Transportation Alliance Bank Inc during the course of my relationship with you.

# DEBTOR IN POSSESSION
# ACCOUNTS RECEIVABLE PURCHASE AND SECURITY AGREEMENT

THIS ACCOUNTS RECEIVABLE PURCHASE AND SECURITY AGREEMENT ("Agreement") is entered into this 16 th day of September, 2019, by and between Transportation Alliance Bank Inc. d/b/a TAB Bank ("Purchaser") and the Debtor-in Possession Coastal International, Inc. ("Seller") the debtor in *In re Coastal International, Inc.*, Case No. 8:19-bk-13584-TA pending in the United States Bankruptcy Court for Central District of California (the "Bankruptcy Court").

1. **Definitions.** The following terms used herein shall have the meanings as set forth immediately below. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

"Account" – any and all Accounts as defined in the UCC, accounts receivable, chattel paper as defined in the UCC, any and all amounts owing to Seller under any rental agreement or lease, payments on construction contracts, promissory notes or on any other indebtedness, any rights to payment customarily or for accounting purposes classified as accounts receivable, and all rights to payment, proceeds or distributions under any contract of Seller, presently existing or hereafter created, and all proceeds thereof.

"Account Debtor" – shall mean any Person obligated for payment of any Account.

"Administration Discount" – the per diem discount charged by Purchaser to Seller on each Purchased Account, which discount is based upon the number of days from the Purchase Date to the date the Account is Closed, said initial discount being set forth in Exhibit A attached hereto. The discount charged for each increment of time is cumulative, with each increment's discount being summed to calculate the total Administration Discount on a given Purchased Account. Purchaser may change the Administration Discount applicable to existing or future Purchased Accounts at any time, after giving Seller thirty (30) days prior written notice.

"Administration Fee" – means an administration fee equal to the cumulative uncollected balance of the Purchase Price of all outstanding Purchased Accounts (which are not Closed) minus the balance in the Reserve Account multiplied by the percentage specified on Exhibit A, attached hereto.

"Annual Fee" – means an annual fee equal to the Maximum Amount multiplied by the percentage specified on Exhibit A, attached hereto. This fee shall be deducted annually from the Purchase Price otherwise owed by Purchaser to Seller on the Purchased Accounts, on or before each anniversary of the date this Agreement is accepted by Purchaser.

"Attorney Documentation Fee" – a fee charged by Purchaser to Seller for the attorney's fees incurred by Purchaser to document this Agreement, in an amount equal to the amount set forth in Exhibit A, attached hereto. This fee shall be deducted one time from the Purchase Price otherwise owed by Purchaser to Seller on the Purchased Accounts at the time of the first submission of Accounts to Purchaser to purchase.

"Avoidance Claim" – any claim that any payment received by Purchaser from or for the account of an Account Debtor is an impugned or avoidable transaction under any bankruptcy, insolvency, preference, corporate or other similar laws.

"Balance Subject to Discount Fee" – the cumulative unpaid balance of the Purchase Price of all outstanding and unclosed Purchased Accounts minus the balance in the Reserve Account.

"Business Day" – any day other than a Saturday, Sunday and any day on which banks in the State of Utah are required or permitted to be closed.

"Clearance Days" – three (3) Business Days.

"Closed" – a Purchased Account is closed upon the first to occur of: (i) receipt of full payment by Purchaser; (ii) the unpaid Face Amount has been charged to the Reserve Account by Purchaser pursuant to the terms hereof; or (iii) if the unpaid Face Amount is five percent (5%) or less of the original Face Amount, or if the original Face Amount was less than $500 then if any payment is received on the Purchased Account that is less than 100%, then said Purchased Account shall be charged to the Reserve Account by Purchaser and the Purchased Account shall be closed. The closure of any Purchased Account by Purchaser shall not be construed so as to relieve Seller of any of its Obligations provided herein. Seller shall not be deemed to have satisfied its repurchase obligation if a Reserve Shortfall exists.

"Collateral" – any collateral now or hereafter described in any financing statement, continuation statement, financing change statement, or any other UCC-1 filing, or any other amendment, or similar security filing or registration statement filed against or executed by Seller naming Purchaser as the secured party, and all of Seller's right, title and interest in, to and under the following property, now owned or hereafter acquired:

(i) All Accounts (including any Exclusions and any Accounts purchased by Purchaser hereunder and repurchased by Seller), chattel paper, general intangibles, including, but not limited to, tax refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, trade secrets, customer lists, licenses, documents, instruments, deposit accounts, certificates of deposit, and all rights of Seller as a seller of goods, including rights of reclamation, replevin and stoppage in transit;

(ii) All Inventory as defined in the Uniform Commercial Code, wherever located, all goods, merchandise or other personal property held for sale or lease, names or marks affixed thereto for purposes of selling or identifying the same or the seller or manufacturer thereof and all related rights, title and interest, all raw materials, work or goods in process or materials or supplies of every nature used, consumed or to be used in Seller's business, all packaging and shipping materials, and all other goods customarily or for accounting purposes classified as inventory of Seller, now owned or hereafter acquired or created, all proceeds and products of the foregoing and all additions and accessions to, replacements of, insurance or condemnation proceeds of, and documents covering any of the foregoing, all property received wholly or partially in trade or exchange for any of the foregoing, all leases of any of the foregoing, and all rents, revenues, issues, profits and proceeds arising from the sale, lease, license, encumbrance, collection, or any other temporary or permanent disposition of any of the foregoing or any interest therein;

(iii) All Equipment and fixtures and goods, wherever located, and all additions, substitutions, replacements (including spare parts), and accessions thereof and thereto;

(iv) All books and records relating to all of the foregoing property and interests in property, including, without limitation, all computer programs, printed output and computer readable data in the possession or control of the Seller, any computer service bureau or other third party;

(v) All investment property; and

(vi) All proceeds of the foregoing, including but not limited to, all insurance proceeds, all claims against third parties for loss or destruction of or damage to any of the foregoing, and all income from the lease or rental of any of the foregoing.

"Default Rate" means the per annum Discount Fee Rate plus five percent (5.00%) per annum

"Discount Fee Rate" – a per annum rate of interest applied on a per diem basis, in the amount set forth in Exhibit A attached hereto. Purchaser may change the Discount Fee Rate applicable to existing or future Purchased Accounts at any time, after giving Seller thirty (30) days prior written notice.

"Early Termination Fee" – an amount equal to the Minimum Monthly Fee multiplied by the number of months (prorated for partial months) by which the termination date requested by Seller precedes the date that is twenty (24) months after the date of this Agreement. The Early Termination Fee represents the costs incurred by Purchaser to set up the required accounting system. This cost is factored into the charges over time but must be recouped in the event of an early termination. This Agreement shall not be effective until approved by entry of an order of the Bankruptcy Court.

"Eligible Account" – see Section 3 hereof.

"Events of Default" – see Section 16 hereof.

"Exclusions" – The Accounts from time to time which Seller elects not to offer to sell to Purchaser (in each instance constituting all of the Accounts of a subject Account Debtor), and which Purchaser consents, in writing, at Purchaser's sole discretion and judgment, to allow Seller to exclude from its offer of sale to Purchaser. Such excluded Accounts shall still be subject to Purchaser's security interest as granted by Seller herein to secure the performance of Seller's Obligation hereunder. Upon any Event of Default, the excluded Accounts shall cease to be excluded, and Seller shall be deemed to have offered said Accounts to Purchaser for purchase.

"Face Amount" – the total amount due specified on an Account's invoice, at the time of Purchase, less any finance charges included therein.

"Guarantor" – the Person(s) guaranteeing the payment and performance of the Obligations, as set forth in Exhibit A attached hereto.

"Invoice" – the document(s) that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

"Late Charge" – 0.15% per diem.

"Late Payment Date" – the date which is ninety (90) days from the Invoice date of a Purchased Account.

"Maximum Amount" – see Exhibit A attached hereto, or such other amount as Purchaser shall deem appropriate in its sole discretion.

"Minimum Monthly Fee" means a fee equal to the Maximum Amount multiplied by the percentage specified on Exhibit A.

"Misdirected Payment Fee" – fifteen percent (15%) of the total amount of any check or other payment which includes, in whole or in part, payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next Business Day following the date of receipt by Seller.

"Missing Notation Fee" – fifteen percent (15%) of the Face Amount.
"Notation" – "This account has been assigned and is payable to Transportation Alliance Bank Inc. dba TAB Bank. To the extent that you are now indebted, or may in the future become indebted to the Seller on any account or general intangible, payment thereof should be made payable to Seller, and sent to TAB Bank, P.O. Box 150290, Ogden, Utah 84415-0290."

"Obligation" – all present and future obligations owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any bankruptcy, insolvency or other similar proceeding in which Seller is a debtor or an insolvent debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

"Origination Fee" – a fee charged by Purchaser to Seller, in an amount equal to the Maximum Amount multiplied by the percentage set forth in Exhibit A, attached hereto. This fee shall be deducted one time from the Purchase Price otherwise owed by Purchaser to Seller on the Purchased Accounts at the time of the first submission of Accounts to Purchaser to purchase.

"Parties" – Seller and Purchaser.

"Person" – any individual, corporation, limited liability company, partnership, trust; or any other legal entity or organization.

"Petition Date" – September 15, 2019.

"Post-Petition Account" – An Account wherein the service(s) rendered or sale(s) of property, giving rise to the right to payment of a monetary obligation to the Seller by the Account Debtor and the invoice and/or other documents evidencing the right to payment to the Seller, arose after the Petition Date.

"Purchased Accounts" – Accounts purchased hereunder which have not been Repurchased.

"Purchase Date" – the date on which Seller has been advised in writing, or in another manner as elected by Purchaser in its sole discretion, that Purchaser has agreed to purchase an Account.

"Purchase Price" – the Face Amount of the Purchased Account.

"Repurchased" – subject to the terms and conditions set forth herein, an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount upon demand by Purchaser under the terms hereof.

"Required Reserve Amount" – the cumulative total of the respective Reserve Percentage for each Purchased Account multiplied by the unpaid balance of each such Purchased Account, or such other percentage as Purchaser shall deem appropriate in its sole discretion.

"Required Reserve Amount" – the cumulative total of the respective Reserve Percentage for each Purchased Account multiplied by the unpaid balance of each such Purchased Account, or such other percentage as Purchaser shall deem appropriate in its sole discretion.

"Reserve Account" – a bookkeeping account on the books of the Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

"Reserve Percentage" – the percentage set forth in Exhibit A attached hereto, or such other percentage as Purchaser shall deem appropriate in its sole discretion.

"Reserve Shortfall" – the amount by which the Reserve Account is less than the Required Reserve Amount.

"Schedule of Accounts" – a paper or electronic form supplied or approved by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms hereof, and from which Purchaser may elect to purchase all or any portion of said Accounts without further notification to Seller being required hereunder.

"Seller's Account" – any demand deposit account maintained by Seller or any Guarantor or represented by an employee of Seller to be maintained by Seller, or any other account of Seller into which Seller directs Purchaser to make advances or payments of any obligations owed by Purchaser to Seller.

"Serviced Account" – an Account that is not purchased by Purchaser hereunder, but which invoice and other documentation underlying said Account is forwarded by Purchaser, on behalf of Seller, to the Account Debtor for payment.

**2. Submission of Accounts to Purchaser.** Seller shall be required hereunder to submit all of Seller's Accounts to Purchaser, excluding only the Exclusions. Seller shall submit said Accounts within seven (7) days of the invoice date after the goods are sold or delivered, or services performed giving rise to the Accounts. Seller shall submit the Accounts via a Schedule of Accounts. Seller shall be free to elect which Accounts it wishes to sell to Purchaser, and which Accounts it does not wish to sell to Purchaser; provided, however, unless otherwise agreed in writing by Purchaser (such consent to be at Purchaser's sole discretion), where Purchaser purchases any Account of a given Account Debtor, Seller shall remit, and Purchaser shall be entitled to receive, all payments on all Accounts of that Account Debtor, regardless of whether or not such Accounts are Purchased Accounts. Purchaser is under no obligation to purchase any Account that is submitted to Purchaser. Any Account which is not purchased by Purchaser shall be deemed to be a Serviced Account; and shall, at Purchaser's option, either be (i) returned to Seller, or (ii) forwarded by Purchaser to the respective Account Debtor for payment as a Serviced Account. In the event Purchaser forwards a Serviced Account on to the Account Debtor for payment, Seller shall pay Purchaser a processing fee equal to $5.00 for each such Serviced Account, said fee to be charged against Seller's Reserve Account. Purchaser shall be authorized to deduct said fee from any amounts owed by Purchaser to Seller. Purchaser's only obligation with regard to a Serviced Account shall be to forward it to the Account Debtor, and to process any collections received by the Account Debtor on the Serviced Account. Purchaser shall deposit in Seller's Reserve Account any funds collected on Serviced Accounts, upon Purchaser's receipt of cleared funds from the Account Debtor. If any payments so received are returned as not collectable or non-sufficient funds, then Purchaser shall notify Seller, whereupon Purchaser shall have no further obligations with regard to the Serviced Account, and Seller may then pursue whatever collection efforts from the Account Debtor that it deems appropriate.

**3. Eligible Accounts.** Purchaser will only consider for purchase those Accounts of Seller, which are Eligible Accounts. To be an Eligible Account, an Account must be a Post-Petition Account, and must meet all of the following requirements and conditions: (i) the Account shall be evidenced by an Invoice submitted to Purchaser meeting the following conditions: (a) contains the Seller's name, Invoice number and date, (b) contains the full and complete name and address of the Account Debtor, (c) clearly sets forth the amount owing and to be collected by Purchaser, (d) clearly states the due date and any other terms for payment of the Account, (e) is completely legible, (f) contains the Account Debtor's applicable purchase order, load number, or other equivalent number, if any, (g) is accompanied by such other documents as are required by Purchaser in its sole discretion, and (h) receives credit approval and is accepted by Purchaser in its sole discretion; (ii) the Account shall be submitted to Purchaser within seven (7) days of the date the goods are sold or delivered, or services performed giving rise to the Account are completed, except as otherwise approved in writing by Purchaser; (iii) the Invoice shall be accompanied by proof of acceptance, delivery (including, at a minimum, the original signed bill of lading, if applicable), or shipment of goods, or performance of services as is acceptable to Purchaser; and (iv) the Account shall meet and comply with the following conditions: (a) Seller has sole and unconditional good title to the Account, and the Account and any goods sold to create the Account being free from any other security interest, assignment, lien or other encumbrance of any type, (b) the Account is a bona fide obligation of the Account Debtor for the Face Amount and there have been no payments, deductions, credits, payment terms, or other modifications or reductions in the amount owing on such Account except as set forth on the face of the Invoice, (c) there are no defenses or setoffs to payment of the Account which can be asserted by way of defense or counterclaim against Seller or Purchaser, (d) the Account will be timely paid in full by the Account Debtor, (e) any services performed or goods sold which give rise to the Account have been rendered or sold and delivered in compliance with all applicable laws, ordinances, rules and regulations and were performed or sold in the ordinary course of Seller's business, (f) there have been no extensions, modifications or other agreements relating to payment of such Account except as shown upon the face of the Invoice, (g) the Account Debtor is located or authorized to do business within the United States, and (h) no proceeding has been commenced or petition filed under any bankruptcy or insolvency law by or against the Account Debtor, no receiver, trustee or custodian has been appointed for any part of the property of the Account Debtor, and no property of the Account Debtor has been assigned for the benefit of creditors. Seller acknowledges and agrees that at Purchaser's sole discretion, Purchaser may require Seller to remit original copies of any documentation relating to an Account, and Seller agrees to promptly send such original documentation to Purchaser.

**4. Sale; Purchase Price; Billing; Reserve.**

Sale. Seller shall offer to sell to Purchaser as absolute owner, such of Seller's Accounts as are listed from time to time on Schedules of Accounts. Each such Schedule of Accounts shall be accompanied by such documentation supporting, validating, and evidencing the listed Accounts as Purchaser shall from time to time request. Purchaser may purchase from Seller such Accounts from the Schedule of Accounts as Purchaser determines to be an Eligible Account, so long as the total outstanding Face Amount of all Purchased Accounts does not exceed, before and after such purchase, the Maximum Amount. However, Purchaser may change the Maximum Amount, either

temporarily or permanently, to accommodate the purchase of any Eligible Account, as Purchaser deems desirable in its sole discretion. Purchaser's purchase of Eligible Accounts is at its sole discretion, and Purchaser shall have no obligation to purchase any Account, Eligible or otherwise, from Seller. Purchaser may decline to purchase any Account submitted by Seller for any reason or for no reason, without notice, regardless of any course of conduct or past purchase of Accounts by Purchaser.

**Exclusivity**. During the term of this Agreement, Purchaser shall be the sole and exclusive purchaser or factor for Seller's Accounts, and Seller shall not sell, factor or otherwise finance its accounts receivable except with Purchaser.

**Purchase Price**. At the request of Seller, Purchaser shall pay all or any portion of the Purchase Price, less any amounts due to Purchaser from Seller (including, without limitation, any Reserve Shortfall, any Administration Fees, and less any other fees and costs provided for in this Agreement) at the Discount Fee Rate, on the Balance Subject to Discount Fee that has accrued but has not yet been paid to Seller, of any Purchased Account, from time to time to Seller's Account. Any portion of the Purchase Price that Seller has not requested to be paid to Seller's Account, shall be held in the Seller's Reserve Account. Upon payment of all or any portion of the Purchase Price to Seller's Account or to Seller's Reserve Account, the Account shall be deemed purchased hereunder.

**Billing**. Purchaser may send a monthly statement to all Account Debtors itemizing their Account activity during the preceding billing period. All Account Debtors will be instructed to make payments to Purchaser.

**Reserve**. Purchaser may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall. Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall.

Provided that no Event of Default exists hereunder, and provided further that Purchaser, in its sole discretion and acting in good faith, has no concerns about Seller's ability to continue to perform its obligations hereunder, Purchaser may pay to Seller any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount. Payment by Purchaser of said funds to Seller shall be made in accordance with any written instructions of Seller which are agreed to by Purchaser. Unless otherwise instructed by Seller, payments shall be made by a medium selected by Purchaser.

Purchaser may charge the Reserve Account with any Obligation, including any amounts due from Seller or Guarantor to Purchaser hereunder. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account. Upon termination of this Agreement, Purchaser may retain the funds in the Reserve Account for ninety (90) days thereafter, or at Purchaser's option, for so long as any Obligations remain outstanding (including without limitation, any Obligations which were unknown to Purchaser at the time of termination), and may apply any such funds as payments towards such Obligations.

5. **Collection Procedures**. Purchaser shall have the exclusive right to collect any and all Accounts whether purchased by Purchaser or otherwise and receive payments thereon. Seller shall not bill for, submit any invoice for, or otherwise attempt to collect or interfere in any manner with the collection of any Accounts except as authorized in writing by Purchaser. Seller agrees to pay all reasonable handling and out of pocket costs incurred by Purchaser in collection of the Accounts, including, without limitation, postage, credit and search expenses, photocopy charges, and long distance phone expenses. Payment of such costs shall be due immediately upon request; and Purchaser may deduct such costs from amounts otherwise owing to Seller by Purchaser. Seller shall promptly and completely respond to all requests from Purchaser for any information or records requested to assist in the collection of said Accounts. If Seller fails to respond to any such request within two (2) days, Purchaser may, where applicable, require Seller to Repurchase the Account. Upon Purchaser's request, Seller may authorize Purchaser to revise the amount of or otherwise modify an Account. Purchaser shall have no obligation to advise the Account Debtor of such revision except to send the Account Debtor any revised invoice, which may be provided to Purchaser by Seller. In the event such revision results in a reduction in the amount owing on any Account, Purchaser may, where applicable, require Seller to Repurchase said Account.

In the event an Account Debtor makes payment to Seller on a Purchased Account, Seller shall immediately deliver the payment to Purchaser. If payment is made in cash, such payment shall be immediately delivered to Purchaser. If payment is made by check or similar instrument, such instrument shall be immediately delivered to Purchaser in the form received without negotiation. Upon inquiry from the Account Debtor or upon request of Purchaser, Seller shall notify the Account Debtor to make payment directly to Purchaser. Any payments received by Seller on Purchased Accounts shall be held in trust by Seller for Purchaser.

Seller shall immediately notify Purchaser in writing of any dispute between Seller and an Account Debtor concerning a Purchased Account, and of any bankruptcy filing, lien, garnishment or other legal action concerning said Account Debtor or Accounts. Purchaser shall make a good faith, commercially reasonable effort to collect the Purchased Accounts. It is agreed that the collection of Accounts in a commercially reasonable manner does not require, and Purchaser shall have no obligation to commence any legal action, including, without limitation, the sending of an attorney's demand letter, to collect any Account. Seller hereby waives and releases any and all claims relating to or arising out of any act or omission by Purchaser in the collection of the Purchased Accounts and Serviced Accounts, only intentional misconduct excepted. Upon request of Purchaser, Seller will cause all payments on all Accounts of Seller, whether or not Purchased Accounts, to be sent directly to such address as may be designated by Purchaser. Purchaser is authorized to receive and open all such payments and retain such amounts as are owing to Purchaser. Upon request of Purchaser, Seller will tender to Purchaser all payments received by Seller from an Account Debtor on Accounts created after Seller begins offering any Accounts of that Account Debtor for purchase by Purchaser. Upon such request being made, all such payments received by Seller shall be the sole and exclusive property of Purchaser and shall be held in trust by Seller for Purchaser. All such payments shall be applied on obligations of that Account Debtor to Purchaser. In the event Purchaser receives any payment from an Account Debtor on an Account which is not a Purchased Account, Purchaser may, subject to any rights of the Account Debtor, apply such payment to any other Obligation of Seller owing to Purchaser, including, without limitation, any Repurchase requirements provided herein or funding of any Reserve Shortfall.

Seller acknowledges and agrees that it has no right, title or interest whatsoever in the funds constituting payment of a Purchased Account, that said funds are the sole and exclusive property of Purchaser, and that any use of or interference with said funds by Seller may result in civil and criminal liability.

6. **Authorization for Purchase**. Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts

upon telephonic, facsimile or other instructions received from anyone purporting to be an officer, employee or representative of Seller.

7. **Fees and Expenses.** Seller shall pay to Purchaser: (i) discount fees, at the Discount Fee Rate, on the Balance Subject to Discount Fee, from the date upon which an Account is purchased hereunder, with said discount fee being due and payable monthly on the last Business Day of the calendar month in which it accrues; (ii) the Administration Fee on each Purchased Account at the time each said Purchased Account is Closed; (iii) any Misdirected Payment Fee immediately upon its accrual; (iv) any Missing Notation Fee on any Invoice that is sent by Seller to an Account Debtor that does not contain the notice as required by Section 12 hereof; (v) any amount by which the sum of the fees and charges earned in any month (prorated for partial months) is less than the Minimum Monthly Fee, to be paid on the last Business Day of the calendar month in which it accrues; (vi) the Early Termination Fee if Seller terminates this Agreement or prepays the Obligations (whether by acceleration or otherwise) prior to the termination date set forth herein, computed from the date of termination to the date on which termination is requested by Seller pursuant to Section 18 hereof; (vii) the Late Charge on all past due amounts due from Seller to Purchaser hereunder, and on the amount of any Reserve Shortfall; (viii) any and all other fees and charges referred to herein, at the earlier of the time required by the terms hereof or when billed by Purchaser; and (ix) any expenses directly incurred by Purchaser in the administration of this Agreement such as wire transfer fees, postage, extra-ordinary collection costs, periodic UCC or tax lien searches, and audit fees, calculated at Purchaser's standard fee schedule, a copy of which will be provided to Seller upon request; (x) in the event any applicable law, statute, rule or regulation shall subject Purchaser or any of its affiliates to any tax levy (other than taxes imposed on or measured by the overall net income of Purchaser), duty, impost, duty, charge, fee, deduction or withholding, or increase the cost to Purchaser of purchasing Accounts due to the application or use of the LIBOR Rate, then upon written demand therefor, Seller shall reimburse Purchaser for all such costs and expenses. Any amounts owed by Seller to Purchaser shall be paid by Seller, at Purchaser's option, by: (a) charging said amounts to the Reserve Account; (b) deducting said amounts from the Purchase Price otherwise directed by Seller to be deposited into Seller's Account; (c) debiting said amounts from Seller's Account; or (d) Seller's paying said amounts, in cash or other good funds acceptable to Purchaser, immediately upon demand made by Purchaser.

8. **Repurchase of Accounts.** Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof, together with any unpaid fees relating to the Purchased Account(s) on demand: (i) any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, or upon which the Account Debtor has taken any offsets, credits, discounts and/or short pays, Purchaser being under no obligation to determine the bona fides of such dispute; (ii) all Purchased Accounts upon the occurrence of an Event of Default, or upon the termination date of this Agreement; and (iii) any Purchased Account which remains unpaid beyond the Late Payment Date or in which Purchaser for any reason, in good faith, believes that such Purchased Account will not be timely paid by the Account Debtor. Seller agrees that any repurchase pursuant to the terms and conditions herein shall not authorize Seller to collect any outstanding sum owing on a Repurchased Account from an Account Debtor and Purchaser may in its sole judgment and discretion charge any and all amounts owed by Seller herein to Seller's Reserve Account. Seller further agrees that any and all repurchase requirements herein shall be considered paid to Purchaser only after all payment and performance obligations and the Obligations owing to Purchaser by Seller have been indefeasibly paid in full.

9. **Security Interest.** As collateral securing the Obligations, Seller grants to Purchaser a continuing first priority perfected security interest in, to and under the Collateral. Notwithstanding the creation of said security interest, the relationship of the parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower.

10. **Clearance Days.** For all purposes under this Agreement, including but not limited to the determination of when a Purchased Account is Closed, Clearance Days will be added to the date on which any payment is received by Purchaser, or on which it is Repurchased by Seller.

11. **Authorization to Purchaser.** Seller hereby irrevocably authorizes Purchaser at Seller's expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full: (i) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof; (ii) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the Accounts and other Collateral; (iii) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller; (iv) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any Account Debtor or other obligor (including filing of any public record releasing any lien granted to Seller by such Account Debtor), without affecting any of the Obligations; (v) execute in the name of Seller and file against Seller in favor of Purchaser financing statements or amendments with respect to the Collateral; (vi) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable; (vii) file in the name of Seller or Purchaser or both: (a) mechanic's lien or related notices or (b) claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty; and (viii) notify any Account Debtor obligated with respect to any Account, including but not limited to any and all Exclusions, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser.

In consideration of Purchaser accepting the Accounts of Seller for purchase, Seller hereby releases and exculpates Purchaser, its officers, employees and designees, upon each submission of Accounts to Purchaser by Seller, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special, punitive, consequential or exemplary damages. Without limiting the generality of the foregoing, Seller releases Purchaser from, and expressly waives any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

Seller authorizes Purchaser to accept, endorse and deposit on behalf of Seller any checks tendered by an Account Debtor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such

action by Purchaser effects an accord and satisfaction of Seller's claims, under the Uniform Commercial Code, or otherwise.

In order to satisfy any of the Obligations, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH system to Seller's Account or any other deposit account maintained by Seller wherever located. Seller may only terminate this authorization by giving Purchaser thirty (30) days' prior written notice of termination.

12. Covenants by Seller. Seller shall not, without the prior written consent of Purchaser, which consent shall be in Purchaser's sole discretion: (i) grant any extension of time for payment of any of the Accounts or any other Collateral which includes a monetary obligation, (ii) compromise or settle any of the Accounts or any such other Collateral for less than the full amount thereof, (iii) release in whole or in part any Account Debtor or other person liable for the payment of any of the Accounts or any such other Collateral, (iv) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts or any such other Collateral; or (v) sell, pledge, transfer, assign or grant a security interest in any of the Collateral.

From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to any Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records as Purchaser may request. Seller shall reimburse Purchaser for all costs incurred by Purchaser relating thereto, including, without limitation, costs of any and all third parties retained by Purchaser. Without expense to Purchaser, Seller agrees that Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

Before sending any Invoice evidencing an Account to an Account Debtor, Seller shall mark same with the Notation, or such other notation as Purchaser shall have advised Seller in writing.

Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require. Seller shall not create, incur, assume or permit to exist any lien upon or with respect to any Collateral now owned or hereafter acquired by Seller.

Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion, said acceptance not being unreasonably withheld by Purchaser. Seller shall furnish to Purchaser: (i) upon written request, any and all information concerning such insurance carried; and (ii) as requested by Purchaser, lender loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty (30) days' prior written cancellation notice to Purchaser.

Seller agrees to maintain motor vehicle, casualty, cargo, commercial and general liability insurance with a responsible insurance company reasonably acceptable to Purchaser in such amounts and against such risks as is usually carried by responsible companies engaged in similar business; and cause Purchaser to be designated as additional insured with respect to such insurance; obtain the certification of such insurer that such insurance shall not be cancelled or terminated, nor shall the coverage or terms or exclusions thereof be materially modified without at least thirty (30) days prior written notice to Purchaser.

Seller hereby assigns to Purchaser all of its interest in and rights to any inventory or other goods giving rise to the Accounts purchased by Purchaser which may be returned by Account Debtors, all rights as an unpaid vendor or lienor, all rights of stoppage in transit, replevin and reclamation relating thereto, all rights in and to all security therefore and guarantees thereof, all rights against third parties with respect thereto, and all rights under the Uniform Commercial Code and any other law, statute, regulation or agreement. Any goods so recovered or returned shall be set aside, marked with the name of Purchaser, and held for the account of Purchaser. Seller will promptly notify Purchaser of all such returned or recovered inventory or goods. Upon request, Seller shall deliver such inventory or other goods to Purchaser. Purchaser may take possession of such inventory or other goods and resell such inventory or other goods. Seller shall pay all reasonable costs and expenses incurred in taking possession and selling such inventory and other goods, including, without limitation, reasonable attorney's fees and legal expenses, transportation expenses, storage expenses, insurance and sales commissions. Such reasonable costs and expenses shall constitute additions to the Obligation owed by Seller to Purchaser. All proceeds from such resale shall be retained by Purchaser and the net proceeds credited against the Obligation of Seller. Purchaser and Seller agree that Purchaser's rights articulated in this paragraph are subject and limited to the extent allowed by the Bankruptcy Court during any pending proceeding wherein Seller is a debtor or debtor-in-possession.

Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee pursuant to the terms hereof, Seller shall deliver in kind to Purchaser on the next Business Day following the date of receipt by Seller the amount of any payment received by Seller on account of a Purchased Account. Seller hereby agrees to indemnify and hold Purchaser harmless from any loss arising out of: (i) the receipt by Seller of any payment on a Purchased Account and failure by Seller to timely remit such payment; and (ii) the assertion of any Avoidance Claim. Seller shall notify Purchaser within two (2) Business Days of it becoming aware of the assertion of an Avoidance Claim.

Seller agrees to submit financial statements to Purchaser, upon Purchaser's request, and Seller shall cause anyone guaranteeing Seller's Obligations hereunder to submit financial statements for such Guarantor to Purchaser as may be requested by Purchaser. All such financial statements shall be prepared in accordance with generally accepted accounting principles and shall be in a form and from an reputable accounting firm. Seller hereby represents and warrants that all financial statements of Seller, and of any Guarantor submitted to Purchaser shall fairly present the financial condition of Seller and any such Guarantor as of the date thereof and the results of operations for the period or periods covered thereby. Seller further represents and warrants, that since the date of the most recent financial statements, and since the date of the most recent purchase of Accounts by

Purchaser from Seller, there has been no material or adverse change in the financial condition of Seller or any such Guarantor.

Seller hereby consents to Purchaser's disclosing to any third party, any and all information, knowledge, reports and records, including, without limitation, financial statements, concerning Seller or any Guarantor.

13. **Account Disputes.** Seller shall notify Purchaser promptly of, and if requested by Purchaser will settle, any disputes concerning any Purchased Account at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms as Purchaser in its sole discretion deems advisable, for Seller's account and risk at Seller's sole expense. Upon the occurrence of an Event of Default, Purchaser may Resolve such issues with respect to any Account of Seller.

14. **Perfection of Security Interest.** Seller shall execute and deliver to Purchaser such documents and instruments, including, without limitation, Uniform Commercial Code financing statements, as Purchaser may request from time to time in order to evidence and perfect its security interest in any Collateral securing the Obligations. Seller hereby agrees to reimburse Purchaser in full for any and all costs incurred by Purchaser arising from any actions taken by Purchaser to ensure the priority of its security interest in the Collateral, including but not limited to any and all Uniform Commercial Code searches.

15. **Representations and Warranties.** Seller represents and warrants that: (i) Seller has and shall maintain the full power and authority to own its assets and to conduct the business in which it engages and to enter into and perform its Obligations under this Agreement; (ii) this Agreement constitutes a legal, valid and binding obligation of Seller; (iii) [reserved]; (iv) Seller has been duly organized or incorporated, as the case may be, and is in good standing, under the laws of the state of its organization or incorporation; (v) the place of business of Seller, or, if Seller has more than one place of business, the location of its chief executive office is the location noted in Section 23 hereof, and will not be moved therefrom without at least thirty (30) days' prior written notice to Purchaser; (vi) all records of Seller pertaining to the Purchased Accounts shall be kept and stored in the location noted in Section 23 hereof, and will not be moved therefrom without at least thirty (30) days' prior written notice to Purchaser; (vii) Seller is duly qualified to do business and is in good standing in each jurisdiction where the conduct of its business requires such qualification; (viii) Seller has all necessary licenses and other certificates or permits required for the conduct of its business and all such necessary licenses and other certificates or permits are current and will be maintained at all times; (ix) the execution, delivery and performance by Seller of this Agreement have been duly authorized by all necessary action on the part of Seller, and are not inconsistent with any Articles of Incorporation, Articles of Organization, By-Laws, Partnership Agreement, or other organizational documents of Seller, do not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract or other instrument to which Seller is a party or by which it is bound, and upon execution and delivery hereof, this Agreement will constitute a legal, valid and binding agreement and obligation of Seller, enforceable in accordance with its terms; (x) Seller shall conduct its business in a lawful manner and in compliance with all applicable federal, state and local laws, ordinances, rules, regulations, and orders and shall pay when due all lawfully imposed taxes upon its property, business and income; (xi) except for the disposition of any pending bankruptcy estate wherein Seller is a creditor or debtor, there is no pending or threatened action or proceeding against or affecting Seller before any court, governmental agency or arbitrator, which may, in any one case or in the aggregate, materially adversely affect the financial condition, operations, properties or business of Seller to perform its Obligations under this Agreement; (xii) except for the disposition of any pending bankruptcy estate wherein Seller is a creditor or debtor, Seller has satisfied all judgments, and Seller is not in default with respect to any judgment, writ, injunction, state decree, rule or regulation of any court, arbitrator or federal, municipal, or other governmental authority, commission, board, bureau, agency or instrumentality; and (xiii) this Agreement, the financial statements referred to herein, each Statement of Accounts submitted or to be submitted to Purchaser under this Agreement, and all other statements and Account information furnished or to be furnished to Purchaser in connection herewith, Seller has no actual knowledge of, and said records do not contain, or shall at the time of their submission to Purchaser contain, no untrue statement of a material fact and omit no material fact necessary to make the statements contained therein or herein not misleading.

16. **Default; Events of Default; Waiver; and Effect.** The following events will constitute an Event of Default hereunder: (i) Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser, or any warranty or representation contained herein proves to be false in any way, howsoever minor; (ii) any Guarantor of the Obligations becomes subject to any debtor-relief proceedings not already in existence on the date this Agreement is executed; (iii) any such Guarantor fails to perform or observe any of such Guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever; and/or (iv) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

Subject to approval of the Bankruptcy Court in any proceeding already filed as of the date of this Agreement, Seller waives any requirement that Purchaser inform Seller by affirmative act or otherwise of any acceleration of Seller's obligations hereunder. Further, Purchaser's failure to charge or accrue interest or fees at any "default" or "past due" rate shall not be deemed a waiver by Purchaser of its claim thereto.

Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations, including the Early Termination Fee, shall become immediately due and payable without notice. The Late Charge and Default Rate shall accrue and be payable on demand on any Obligation not paid when due, including without limitation, pre judgment and post judgment.

No failure to exercise and no delay in exercising any right, power or remedy hereunder shall impair any right, power or remedy which Purchaser may have, nor shall any such delay be construed to be a waiver of any of such rights, powers or remedies, or any acquiescence in any breach or default hereunder, nor shall any waiver by Purchaser of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Purchaser hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce any such right or remedy. The rights and remedies specified herein are cumulative and

not exclusive of each other or of any rights or remedies which Purchaser would otherwise have. Any waiver, permit, consent or approval by Purchaser of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance; and shall not be effective until Seller has paid to Purchaser a $50.00 default waiver fee.

17. Account Stated. Purchaser shall render or make available to Seller a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Seller as an account stated, except to the extent that Purchaser receives, within sixty (60) days after the mailing or making available of such statement, written notice from Seller of any specific exceptions by Seller to that statement, and then it shall be binding against Seller as to any items to which it has not objected.

18. Termination; Effective Date. This Agreement shall be effective when accepted by Purchaser and approved by order of the U.S. Bankruptcy Court (the "Bankruptcy Court"), and shall continue in full force and effect until the earlier to occur of (a) a "Termination Event" as defined in the Interim Order Authorizing Debtor to Factor Accounts Receivable (as extended by any interim or final order with respect thereto acceptable to Purchaser in its sole discretion), (b) the Seller's bankruptcy case (i) being dismissed or (ii) converted from a Chapter 11 of the Bankruptcy Code to a case under Chapter 7 of the Bankruptcy Code, (c) the appointment of a trustee or examiner in the Seller's bankruptcy case; (d) the occurrence of an Event of Default under this Agreement, or (e) the occurrence of an event of default under the Bankruptcy Court's interim or final order, as applicable, which is not cured within any time period permitted by such interim or final order approving this Agreement that causes this Agreement to terminate, or allows Purchaser to elect to terminate this Agreement and Purchaser elects to do so. Upon termination, Seller shall pay in full all Obligations to Purchaser, including any Early Termination Fee. Notwithstanding anything in this Agreement to the contrary, and assuming no Event of Default by Seller (in which event Purchaser may terminate without notice), Purchaser may terminate this Agreement at any time by giving not less than thirty (30) days notice in which event, Seller shall not be obligated to pay the Early Termination Fees.

19. Choice of Law and Venue. This Agreement and all transactions or disputes arising directly or indirectly hereunder shall be governed by, construed under and enforced in accordance with the internal laws of the State of Utah. The Parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance, or breach of this Agreement shall, if Purchaser so elects, be instituted in the Bankruptcy Court.

20. Attorneys Fees. Subject to any applicable provisions of the Bankruptcy Code, Seller agrees to reimburse Purchaser on demand for: (i) the actual amount of all costs and expenses, including all costs of court, attorneys' fees, witness fees, expert fees, and other costs and fees which Purchaser has incurred or may incur in: (a) negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith, all of which shall be paid contemporaneously with the execution hereof, (b) any way arising out of this Agreement, and (c) protecting, preserving or enforcing any lien, security interest or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claim; (ii) the actual costs, including photocopying (which if performed by Purchaser's employees shall be at the rate of $.25/page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Seller is a party; and (iii) the actual amount of all costs and expenses, including attorney's fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (1) arising out of the automatic stay, (2) contesting dischargeability or seeking dismissal or conversion of the bankruptcy proceeding or (3) opposing confirmation of Seller's plan thereunder. Any such costs and expenses incurred subsequent to the execution hereof shall become part of the Obligations when incurred and may be added to the outstanding principal amount due hereunder. Notwithstanding the existence of any law, statute or rule, in any jurisdiction which may provide Seller with a right to attorneys' fees or costs, Seller hereby waives any and all rights to hereafter seek attorneys' fees or costs hereunder and Seller agrees that Purchaser exclusively shall be entitled to indemnification and recovery of any and all attorney's fees and costs in respect to any litigation based hereon, arising out of, or related hereto, whether under, or in connection with, this and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either Party.

21. Jury Trial Waiver. IN RECOGNITION OF THE HIGHER COSTS AND DELAYS WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING HEREUNDER, OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY; AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHTS TO TRIAL BY JURY.

22. Miscellaneous. Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given orally (even if supported by new consideration), but only by an instrument in writing signed by all Parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any termination or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form reasonably satisfactory to Purchaser. Seller understands that this provision constitutes a waiver of its rights under Sections of Article 9 of the UCC.

Unless otherwise expressly stated in any other agreement between the Parties, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control. All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory. In the event any one or more

of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

This Agreement and all agreements relating to the subject matter hereof are the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly. The relationship of the Parties hereto shall be that of seller and purchaser of accounts, and neither party is or shall be deemed a fiduciary of or to the other.

All exhibits referenced in this Agreement are expressly incorporated herein by this reference. This Agreement, the documents or instruments referred to herein and all subsequent amendments, modifications or substitutions, embody the entire agreement and understanding of the parties hereto with respect to the subject matter herein. No promises of any kind have been made by Purchaser or any third party and Seller has not relied upon any promises, representations, warranties (either express or implied), agreements, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement shall supersede all prior agreements and understandings between the parties with respect to such subject matter hereof and no course of dealing, course of performance or trade usage, and no parol evidence of any nature, shall be used to supplement or modify any terms of this Agreement. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

This Agreement is not assignable or transferable by Seller and any such purported assignment or transfer is void. This Agreement shall be binding upon the successors of Seller, including any and all successor Persons. Purchaser is hereby authorized to file UCC financing statements against any such successor, and Seller shall hold Purchaser harmless from any loss or liability resulting from or arising out of Purchaser's actions against said successors. Purchaser is also authorized to contact any lender or factor of the successor Person. Seller acknowledges and agrees that Purchaser may assign all or any portion of this Agreement including, without limitation, assignment of the rights, benefits and remedies of Purchaser hereunder without any assignment of the duties, obligations or liabilities of Purchaser hereunder.

23. Notice. All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, (ii) transmittal by electronic means, including facsimile, to a receiver under the control of such party, or (iii) actual receipt by such party or an employee or agent of such party. All notices required to be given to Purchaser hereunder shall be deemed given upon actual receipt of certified mail by the officer of Purchaser set forth below, or his successor.

For the purposes hereof, notices hereunder shall be sent to the following addresses or to such other addresses as each such Party may in writing hereafter indicate:

| | |
|---|---|
| Seller: | Coastal International, Inc., Debtor in Possession |
| Address: | ____________________<br>____________________<br>____________________<br>____________________ |
| Attn: | ____________________ |
| Fax: | (__) ___-____ |
| Purchaser: | Transportation Alliance Bank Inc.<br>d/b/a TAB Bank |
| Address: | 4185 Harrison Blvd., Ste. 200<br>Ogden, Utah 84403 |
| Attn: | V.P. A/R Finance Operations |
| Fax: | (801) 624-5309 |

The Parties, by their duly authorized representatives, hereby execute this Agreement.

**SELLER:**
Coastal International, Inc., Debtor-in-Possession

Bruce E. Green
Name: BRUCE E. GREEN
Title: CEO

STATE OF California )
) ss.
COUNTY OF Marin )

On this 16th day of September, 2019, before me, the undersigned notary, personally appeared Bruce E. Green _______, who being by me duly sworn did state, that he/she is the CEO of Coastal International, Inc., Debtor in Possession, the company that executed the within instrument, and acknowledged to me that such company executed the same and that he/she was authorized to execute said instrument.

WITNESS my hand and official seal.

MARTIN KONOPASKI
COMM. # 2234924
NOTARY PUBLIC-CALIFORNIA
MARIN COUNTY
MY COMM. EXP. APR. 15, 2022

Notary Public

My Commission Expires: April 15, 2022

Residing At: Mill Valley, CA 94941

**EXHIBIT A**

**Administration Discount:**

| Number of Days from Purchase Date to Date Account is Closed | Total Discount Percentage |
|---|---|
| 01 to 90 days | .008% per diem |

**Discount Fee Rate:** Seller shall pay interest to Purchaser on the outstanding Obligations of the Agreement at a variable per annum rate equal to the LIBOR Rate plus 7.500%. As of the date hereof, LIBOR Rate is 2.13%, therefore the corresponding Discount Fee Rate is 9.63% per annum, with a per diem rate of .02675% (9.63% divided by 360 days). Notwithstanding the foregoing, at no time shall the LIBOR Rate applicable to calculating the Discount Fee Rate be less than 2.13%.

**LIBOR Rate**: For purposes of this Agreement, the term ***"LIBOR Rate"*** shall mean the rate of interest quotations for the ninety (90) day London InterBank Offered Rate, as published by the *Wall Street Journal,* commonly known as the "90 day LIBOR Rate" or "Three-Month LIBOR Rate", or, if no longer provided or published by the *Wall Street Journal,*

4833-9271-4405\3

such rate as shall be determined in good faith by Purchaser from such sources as Purchaser shall determine to be comparable to the Wall Street Journal. Each change in the LIBOR Rate contemplated hereunder shall take place automatically, without further notice, and shall be conclusive absent manifest error. Any change in the LIBOR Rate shall be effective as of the first business day following such adjustment, and such adjusted LIBOR Rate shall be the applicable LIBOR Rate thereafter used in the calculation of interest payable hereunder.

| | |
|---|---|
| Maximum Amount: | $4,000,000.00 |
| Origination Fee: | $20,000.00 |
| Attorney Documentation Fee: | $2,000.00 |
| Annual Fee Percentage: | 0.05% |
| Minimum Monthly Fee: | 0.25% |
| Advance Percentage: | 90% |
| Reserve Percentage: | 10% |
| Guarantors: | Coastal International Holdings, LLC<br>Coastal International Trade Show Services, LLC<br>Bruce E. Green |

Main Document Page 63 of 64

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**650 Town Center Drive, Suite 600, Costa Mesa, California 92626**

A true and correct copy of the foregoing document entitled (*specify*): **EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN POST PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362 AND 364; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF BRUCE GREEN IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **September 17, 2019**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date)* **September 17, 2019**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **September 17, 2019**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Theodor C. Albert, 411 W. 4th Street, 5th Floor, Santa Ana, CA 92701

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 17, 2019 | Kelly Adele | Kelly Adele |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
0.0

**F 9013-3.1.PROOF.SERVICE**

**VIA EMAIL**
Office of the U.S. Trustee
Attn: Nancy Goldenberg
411 W. 4th Street, Suite 9041
Santa Ana, CA  92701
Email: nancy.goldenberg@usdoj.gov

Steven Waterman
Dorsey & Whitney LLP
111 S. Main Street, Suite 2100
Salt Lake City, UT  84111
Email: waterman.steven@dorsey.com
**Attorneys for TAB Bank**

Leib M. Lerner
Alston & Bird
333 South Hope Street, 16th Floor
Los Angeles, CA 90071-3004
Leib.lerner@alston.com

Global Experience Specialist
c/o David Emerzian
McCORMICK, BARSTOW, SHEPPARD, WAYTE
7647 N. Fresno Street
Fresno, CA 93720
Email: demerzian@mccormickbarstow.com

**Electronic Mail Notice List**
Reem J Bello    rbello@wgllp.com,
kadele@wgllp.com;vrosales@wgllp.com;cyoshonis@wgllp.com;cbmeeker@gmail.com
Jeffrey I Golden    jgolden@wgllp.com, kadele@wgllp.com;vrosales@lwgfllp.com;cbmeeker@gmail.com
Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
Leib M Lerner    leib.lerner@alston.com, autodockettest-lax@alston.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov